[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 11-15355
_____

D.C. Docket No. 5:11-cv-01461-IPJ

LYNNE HALES CHAFIN,

Plaintiff-Appellee,

versus

JEFFREY LEE CHAFIN,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(December 18, 2013)

Before WILSON and DUBINA, Circuit Judges, and MIDDLEBROOKS,* District
Judge.

PER CURIAM:

Jeffrey Chafin (Mr. Chafin) appeals the decision of the district court,

following a bench trial, to grant Lynne Chafin's (Ms. Chafin) petition for wrongful

_____

* Honorable Donald M. Middlebrooks, United States District Judge for the Southern District of
Florida, sitting by designation.

removal under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670 (Convention).[1]  Because we conclude that Mr. Chafin has not demonstrated that the district court's findings of fact were clearly erroneous, and that it correctly applied the law to the facts, we affirm.

## I.

Mr. Chafin, a United States citizen, married Ms. Chafin, a citizen of the United Kingdom, in 2006.  While Mr. Chafin was deployed to Afghanistan, Ms. Chafin took their daughter, E.C., to Scotland.  Later, Mr. Chafin was transferred to Alabama.  It was around this time that the couple began to experience marital conflict.  In February 2010, after several years of living in Scotland, Ms. Chafin took E.C. to Alabama for what the district court concluded was "at most . . . a trial period, which did not work out."  Following attempts at reconciliation, Mr. Chafin filed for divorce and custody in Alabama.  The district court found that Mr. Chafin removed E.C.'s passport, wrongfully retaining E.C. in the United States and

---

[1] Mr. Chafin's appeal is before us following remand from the United States Supreme Court.  In December 2011, Ms. Chafin moved to dismiss his appeal as moot, and relying on *Bekier v. Bekier*, 248 F.3d 1051 (11th Cir. 2001), we granted Ms. Chafin's motion.  In *Bekier*, we held that an appeal of a return order under the Convention is mooted when the child has been returned to a foreign country, as the return renders a district court powerless to grant relief.  *Id.* at 1054–56.  The Supreme Court vacated our decision and remanded with instructions to proceed to the merits of Mr. Chafin's appeal.  *Chafin v. Chafin*, __ U.S. __, 133 S. Ct. 1017, 1028 (2013).  The Supreme Court held that Mr. Chafin's appeal was not rendered moot because it was uncertain whether the determination of his daughter's habitual residence was correct.  *Id.*

effectively preventing Ms. Chafin from returning to Scotland.[2]  In February 2011, following a charge for domestic violence which was subsequently dropped, Ms. Chafin was deported.[3]  After a bench trial, the district court found that E.C.'s country of habitual residence was Scotland and that Mr. Chafin failed to establish by clear and convincing evidence that returning E.C. to Scotland would expose her to grave risk of harm.

## II.

Congress implemented the Convention when it passed the International Child Abduction Remedies Act (ICARA).  *See* 42 U.S.C. § 11601(b)(4).  The United Kingdom is also a signatory to the Convention.  *See Chafin*, 133 S. Ct. at 1022; Hague Conference on Private Int'l Law, Status Table, Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, http://www.hcch.net.  The Convention seeks "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access."  *Hanley v. Roy*, 485 F.3d 641, 644

---

[2] Mr. Chafin maintains that the district court erred in finding that he removed E.C.'s passports, insisting that he removed only her U.K. passport and that Ms. Chafin could have returned to Scotland with E.C. using only her U.S. passport.

[3] With respect to this arrest, the district court explained: "While the court does not specifically find that the respondent manufactured the entire event he reported to 911 and to which he testified before the undersigned, the court does note that respondent's version of those events ranged from a point of questionable veracity to complete incredulity. . . . The charges were later dismissed with prejudice upon motion of the prosecution."

(11th Cir. 2007) (internal quotation marks omitted).   Congress enacted the Convention in order to "ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Convention, art. 1.

When a child who was habitually residing in one signatory state is wrongfully removed to, or retained in, another, Article 12 of the Convention provides that the latter state "shall order the return of the child forthwith."  Under the Convention, an individual may petition a court authorized to exercise jurisdiction in the place where a child is located for the return of the child to his habitual residence in another signatory country.  42 U.S.C. § 11603(b).  The Convention and its implementing legislation empower United States courts to determine only rights under the Convention and not the merits of an underlying child custody dispute.  42 U.S.C. § 11601(b)(4).

Under the Convention and the ICARA, judicial determinations of ICARA petitions requesting the return of children who have been wrongfully taken or retained must be done in an expeditious manner.  Prompt proceedings are advantageous because: (1) they "will help minimize the extent to which uncertainty adds to the challenges confronting both parents and child," *Chafin*, 133 S. Ct. at 1028, and (2) they will allow the jurisdiction of habitual residence to resolve the

custody dispute between the parties. *See Baran v. Beaty*, 526 F.3d 1340, 1350 (11th Cir. 2008) (citations omitted).

The Convention proposes a six-week timeframe from the initial filing of the petition to a decision regarding return. Art. 11. While other countries have enacted provisions containing mandatory timeframes for return proceedings and appeals,[4] Congress did not provide such a timetable when enacting the ICARA. The Supreme Court has recommended that "courts . . . take steps to decide these cases as expeditiously as possible, for the sake of the children who find themselves in such an unfortunate situation." *Chafin*, 133 S. Ct. at 1027.

We have emphasized the importance of expeditious proceedings from the first case that required us to review the ICARA. *See Lops v. Lops*, 140 F.3d 927, 942–45 (11th Cir. 1998), *reh'g en banc denied*, 150 F.3d 1199 (1998), *cert. denied*, 525 U.S. 1158 (1999). In *Lops*, we found that the district court did not abuse its discretion when it decided to promptly hear and determine an ICARA petition even

---

[4] The  Conference on Private International Law, Guide to Good Practice Under the Convention of 25 October 1980 on the Civil Aspects of International Child Abduction, Part IV–Enforcement, § 2.2, ¶ 51-55, at 13–14 (2010), describes the adjudication timetable for several member States. For example, European Union members, except Denmark, have a six-week mandatory time limit from the filing of the application to issue a decision under the Brussels IIa Regulation. *See id*. at ¶ 52, at 13 (citing Council Regulation (EC) No 2201/2003 of 27 November 2003 Concerning Jurisdiction and the Recognition and Enforcement of Judgments in Matrimonial Matters and the Matters of Parental Responsibility, repealing Regulation (EC) No 1347/2000, OJ 2003 L 338, at 1). Israel also sets six weeks as the deadline for the court of first instance to decide a return application and thirty days from the day the appeal was filed for the appellate court. *Id*. In Bulgaria, the court of first instance and the appellate court must decide a return petition within thirty days. *Id*.

though a pending petition was originally filed in state court. *Id*. at 944.[5] We explained that ICARA petitions are meant to be heard expeditiously and the state court was unable to do so. *Id*. at 944. We expressly noted that the district court's prompt determination was "what [the] ICARA contemplated." *Id*.

The case at bar has been ongoing for more than three and a half years.[6] E.C. was four years old when Ms. Chafin filed the petition; she is now at least six years old and the question of her habitual residence still remains. While the procedural history of the instant case is unusual, undoubtedly, this is not what the ICARA contemplated. Courts must remain mindful of determining a child's habitual residence in an expeditious manner, as the Convention and the ICARA require.[7] It

---

[5] In *Lops*, an ICARA petition was filed in a Georgia state court on November 12, 1997, but, finding lack of jurisdiction, the matter was transferred to a South Carolina state court. Several days later, the South Carolina court indicated that it would not hear the case until January 1998, two months after the initial filing, because of an "apparent heavy schedule." *Id*. On December 3, 1997, a new ICARA petition was filed in the Southern District of Georgia. Unlike the state court, the district court was "prepared to, and did, expedite the ICARA petition as required by ICARA." *Id*. at 943–44. By December 22, 1997, the district court had held two full days of hearings, heard oral arguments, and issued an oral order denying the petition. On December 23, 1997, the district court granted a stay of the order pending appeal. This Court expedited the appeal of the matter and issued an order on May 7, 1998.

[6] Ms. Chafin filed the instant petition in May 2010. A two-day bench trial was held and a determination granting Ms. Chafin's petition were issued in October 2011, five months after the initial petition. We promptly issued a decision denying Mr. Chafin's appeal as moot in February 2012, just over a month after he filed the appeal, and denied his petition for hearing *en banc* in April 2012. In December 2012, the Supreme Court held oral arguments and issued its ruling in February 2013. Less than one month later, in March 2013, we ordered Ms. Chafin to respond to Mr. Chafin's appeal. The appeal was ripe in April 2013, but oral arguments were set for November 2013.

[7] While the denial of Mr. Chafin's motion to stay the district judge's order pending appeal is not now challenged, we note, as the Supreme Court did, that

6

may be appropriate for district courts to consider local rules or administrative operating procedures that would ensure expedited consideration.[8]

Under the operative provision of the Convention, a petitioner is required to establish, by a preponderance of the evidence, that her child was "wrongfully removed or retained within the meaning of the Convention."  42 U.S.C. § 11603(e)(1)(A).  Thus, in order to prevail, Ms. Chafin must show that: (1) E.C. was a habitual resident of Scotland immediately before retention in the United States, (2) the retention was in breach of Ms. Chafin's custody rights under Scottish law, and (3) Ms. Chafin had been exercising her custody rights at the time of retention.  Convention, art. 3.  The court's inquiry is limited to the abduction claim, not the underlying custody issues.  *See* 42 U.S.C. § 11601(b)(4).

Importantly, we employ a mixed standard of review for determining habitual residence under the Convention.  *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir.

> Courts should apply the four traditional stay factors in considering whether to stay a return order: (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies."

*Chafin*, 133 S. Ct. at 1027 (internal quotation marks and citations omitted).  Applying these factors will ensure that courts do not grant stays pending appeal improvidently, especially in the face of the Convention and the ICARA's purpose of promptly returning child to their habitual residence.

[8] From January 1, 2000 through December 5, 2013, approximately 145 ICARA petitions have been filed in this Circuit.  District courts have resolved these cases within an average of roughly 2.2 months, compared to 6.8 months for all civil cases in the fiscal year 2011.  The Circuit's median disposition rate is less than most other Circuits.  Courts should seek to abide by the six-week period provided for in the Convention.

2004) (per curiam).  Accordingly, we review the district court's findings of fact for clear error and its legal determinations and application of the law to the facts de novo.  *Id.*  Further, we have explained that when analyzing the question of habitual residence, after an initial finding that parents lack a settled intent to abandon their child's prior habitual residence for a new one, the burden on the party asserting a change in habitual residence increases.  *Id.* at 1254–55.  In such cases, courts should be hesitant to find a change in habitual residence unless the facts point "unequivocally to a change," or the court can confidently conclude that the child's attachments have changed such that returning them to the original forum would be extremely disruptive.  *Id.* at 1255; *see Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001).

### III.

Mr. Chafin argues that the district court clearly erred in finding that he retained E.C.'s U.K. and U.S. passports because Ms. Chafin had E.C.'s U.S. passport and could have returned to Scotland with E.C. but chose not to leave. Further, Mr. Chafin argues that the district judge erred by deciding to credit Ms. Chafin's testimony during the bench trial more heavily than Mr. Chafin's evidence that she intended to remain in Alabama permanently.  In contrast, Ms. Chafin insists that the objective facts indicate that she came to Alabama on a tourist visa

8

for a trial period to work on her strained marriage and was prevented from returning to Scotland with E.C. because Mr. Chafin hid E.C.'s passports.

Upon review, our analysis in *Ruiz* is instructive. There, we affirmed the district court's initial finding that the parents lacked a shared intention to abandon their prior U.S. residence and make Mexico the habitual residence of their children. *Ruiz*, 392 F.3d at 1254.[9] In the absence of a settled intention to change residence, the court looked to the objective facts, finding that they pointed to a determination that the prior residence had not been abandoned and habitual residence in Mexico was not established. *Id.* at 1255. Despite several facts pointing toward the conclusion that Mexico was their new residence, including the family's length of stay, the construction of a new house, and Mr. Ruiz's employment, we concluded that the entirety of the evidence tended to show that the move from the United States to Mexico was conditional. *Id.* 1255–56.

In the present case, the district judge found that the testimony and evidence established that Ms. Chafin decided to return to Scotland with E.C. in early May 2010, and that but for Mr. Chafin serving her with a petition for divorce and an emergency custody restraining order, she would have left the United States with

---

[9] Courts recognize that where the situation involves a very young child, the shared intent of the parents in determining the residence of their child is of predominant concern. *See Whiting v. Krassner*, 391 F.3d 540, 550 (3d Cir. 2004); *Ruiz*, 392 F.3d at 1253.

her daughter.[10]  Second, Ms. Chafin testified that she and E.C. came to the United

States in February, 2010 on a ninety-day visitor visa that is only issued with proof

of a return ticket.  The district court noted that this evidence was not contradicted.

In an attempt to save their marriage, Mr. and Ms. Chafin took a trip together in

April, 2010, which both agree was unsuccessful.  Ms. Chafin testified that,

following that trip, she and Mr. Chafin agreed to work out a separation so that she

and E.C. could return to Scotland.  However, before Ms. Chafin could return, Mr.

Chafin served her with an emergency custody petition and removed E.C.'s

passports from their location.[11]  Indeed, the district court found credible Ms.

Chafin's testimony that she could not leave the United States without E.C.'s U.K.

passport.  The district court found that E.C. was wrongfully retained in the United

States as of May 15, 2010, when Mr. Chafin removed her passport from its

location.  Further, Ms. Chafin's testimony that she believed Mr. Chafin would be

transferred to Germany in September, 2010 indicated to the district court a lack of

intent to allow E.C. to remain in the United States permanently.  Finally, the

district court emphasized the fact that Ms. Chafin maintained her residence in

---

[10] Indeed, the district judge emphasized that each time E.C. had previously visited the United States, she was either accompanied by Ms. Chafin, or Ms. Chafin had a clear intent and ability to reclaim E.C. and return with her to Scotland following the visit.

[11] E.C. has dual citizenship with the United States and the United Kingdom and thus has two passports.

Scotland and did not cancel E.C.'s planned enrollment in Scottish school when she came to Alabama in February, 2010.

Here, as in *Ruiz*, the district court found that the parties did not have a settled intent to change E.C.'s habitual residence from Scotland to Alabama. We defer to this finding of fact unless it is clearly erroneous, and here, it is not. *Id.* at 1252, 1254–55. When there is no settled intent on the part of the parents to abandon a child's prior habitual residence, "courts should be hesitant to find a change in habitual residence unless objective facts point unequivocally to a change or the court can 'say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount' to changing the child's family and social environment." *Id.* at 1255 (quoting *Mozes*, 239 F.3d at 1081). Here, there are objective facts pointing to each country, and our de novo review confirms that it is not unequivocally clear that E.C.'s habitual residence in Scotland was abandoned for a new habitual residence in Alabama. Therefore, we affirm the district court's decision to grant Ms. Chafin's petition. *See id.* at 1259.

**AFFIRMED.**

11