[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-16568
Non-Argument Calendar
_____

D.C. Docket No. 0:16-cv-62134-BB

MARIA ALEJANDRA REYES OVALLE,

Plaintiff - Appellee,

versus

NOE MANUEL PEREZ,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(March 1, 2017)

Before MARCUS, JILL PRYOR and FAY, Circuit Judges.

PER CURIAM:

Maria Alejandra Reyes Ovalle ("Reyes"), a Guatemalan citizen, has petitioned for relief under the Hague Convention on the Civil Aspects of International Child Abduction, 51 Fed. Reg. 10,494 (March 26, 1986), and its implementing legislation, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9003(b) (together, "Hague Convention").  She alleged that her child's father, Noe Manuel Perez, an American citizen, abducted the child and wrongfully retained him in Florida.  After a bench trial, the district court granted Reyes's petition.  Perez has appealed.  After careful review, we affirm.

## I.    FACTUAL BACKGROUND

The facts of this case are described in detail in the district court's order; we recite here only what is necessary to resolve this appeal.

Perez, a United States citizen and resident of Florida, met Reyes in Guatemala, and the two began a romantic relationship.  Perez traveled to Guatemala frequently, in part to spend time with Reyes.  When Perez visited Guatemala, he stayed at Reyes's parents' house.  When the relationship became more serious, Reyes obtained a tourist visa, valid for ten years, which permitted her to stay in the United States for up to six months at a time.

In March 2015, Perez visited Reyes in Guatemala to attend a friend's wedding.  During this visit, Reyes became pregnant with E.L.  Reyes spent the bulk of her pregnancy in Guatemala.  Both Reyes and Perez expressed a desire to

2

raise their child in a traditional two-parent household, and so, in June 2015, Reyes traveled to the United States to stay with Perez. The parties dispute the purpose of this trip: Reyes testified that she was merely testing the waters to see what life in Florida with Perez would be like; Perez testified that it was their mutual intention to raise their child together in Florida. Reyes left the overwhelming bulk of her personal belongings in Guatemala—including her seven pets. Reyes also owned an auto repair shop in Guatemala, which she did not sell, instead arranging for her mother to manage it in her absence.

Reyes testified that this trial period went poorly, as Perez paid little attention to her and did not seem to care about her pregnancy-related discomfort or other health issues. Perez did not take her to see a doctor or help her to navigate the American health care system. Reyes returned to Guatemala a little over a month after arriving in Florida. She had no intent to return to Florida, noting that her time with Perez had been unpleasant. Nevertheless, Perez persistently attempted to persuade her to return to Florida, visiting Guatemala in August 2015.

On this trip to Guatemala, Perez gave Reyes an engagement ring. Reyes testified that she rejected the ring; Perez testified that Reyes enthusiastically accepted his proposal. Nonetheless, Reyes agreed to give Florida another chance. Perez returned to Guatemala in late September 2015 to bring Reyes back to Florida. Reyes testified that Perez again presented her with an engagement ring,

3

which she accepted but never wore. In early October, Perez and Reyes returned to Florida. Once more, the great bulk of Reyes's possessions, including her pets, remained in Guatemala. Reyes received an offer to purchase her business, but she turned it down in part because she was uncertain that her relationship with Perez in Florida would work. Reyes also had a house under construction in Guatemala at the time, and she did not turn off utilities at the house; indeed, she continued to pay her utility bills even though she was in Florida. She again entered the United States on a tourist visa. According to Reyes, she never told Perez that she was coming to Florida permanently; rather, she told him that she was merely coming to try Florida again. Perez disagreed, testifying it was his understanding that Reyes was coming to Florida to stay and that they both intended to raise a family in Florida.

E.L. was born in Florida in December 2015. According to Reyes, the relationship between Perez and Reyes was deteriorating. Perez disputed this, testifying that their time in Florida was happy. In February 2016, when E.L. was first able to travel, Reyes, Perez, and E.L. took a trip to Guatemala. Because Perez's relationship with Reyes's parents had been strained, Reyes and Perez stayed in separate places during the trip. Reyes stayed with E.L.—and held E.L.'s passport—while Perez stayed with a friend. Reyes testified that upon their arrival in Guatemala, Perez's friend approached Reyes's mother and advised her that

4

Reyes should hold on to E.L.'s documents, as the friend was aware that Perez intended to take E.L. back to the United States.

While in Guatemala, Reyes met with an immigration attorney who advised her that because she had spent almost five months in the United States on a tourist visa—and because she had given birth to a child during that period—she risked being denied entry to the United States again. The attorney also advised her that because Perez and E.L. were American citizens, Perez would be able to enter the United States with E.L. Reyes subsequently applied for and obtained "Security Measures"—essentially, a restraining order against Perez—in Guatemala, claiming that she was "a victim of abuse, psychological, economic, moral and mental violence, threats, indignities and the most important he is threatening me that he will take my son [a]way because he has American nationality." Reyes did not inform Perez about the Security Measures, but did tell him that she and E.L. would not be returning to the United States.

Perez returned to Florida and obtained an "Order to Pick-Up Minor Child" from the Broward County Circuit Court. Perez did not inform Reyes about the order. After finding out about the Guatemalan Security Measures, Perez filed a response in opposition to them. Despite the parties' legal gymnastics, Perez and Reyes continued to communicate with one another. Perez periodically sent money to Reyes to support E.L., and he visited Guatemala on three separate occasions

between April and June 2016.  In Guatemala, E.L. lived with Reyes and her parents and brother, regularly attended church with them, and regularly saw a pediatrician.

On a fourth visit to Guatemala in July 2016—for E.L.'s baptism—Perez devised a scheme to remove E.L. to the United States.  Perez asked Reyes to accompany him to drop off an invitation to the baptism at a friend's house.  E.L. was with Perez and Reyes when they went to drop off the invitation.  Perez asked Reyes to take the invitation to the front door, and when she got out of the car, Perez drove off with E.L.  He then drove back to the United States through Mexico.  After arriving, Perez informed Reyes that he was in the United States with E.L., who was safe.

On September 7, 2016, Reyes filed a verified petition in federal district court requesting relief under the Hague Convention, seeking the return of the child to Guatemala.  The following day, the district court issued a show cause order and set an evidentiary hearing for September 16.  Two days before the hearing, Perez filed a response to the petition and show-cause order.  Then, at the evidentiary hearing, Perez requested a continuance of at least one week.  The district court granted a continuance to September 21.  On September 21, the district court began a four day bench trial.

After the trial, the district court entered an order granting Reyes's petition and requiring E.L.'s immediate return to his mother.  This is Perez's appeal.

## II.    STANDARD OF REVIEW

In deciding an appeal under the Hague Convention, "[w]e review a district court's findings of fact for clear error and its legal conclusions and applications of the law to the facts *de novo*."  *Gomez v. Fuenmayor*, 812 F.3d 1005, 1007 (11th Cir. 2016).  "The clearly erroneous standard is highly deferential and requires that we uphold the district court's factual determinations so long as they are plausible in light of the record viewed in its entirety."  *Id.* at 1007-08 (internal quotation marks omitted).  Determining a child's habitual residence presents a mixed question of fact and law, so the district court's findings of historical facts are reviewed for clear error, "but with regard to the ultimate issue of habitual residence, the appellate court will review *de novo*."  *Seaman v. Peterson*, 766 F.3d 1252, 1258 (11th Cir. 2014) (internal quotation marks omitted).

## III.    DISCUSSION

The Hague Convention is designed "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007) (internal quotation marks omitted).  Under the Hague Convention, if a petitioner demonstrates that a child

was removed wrongfully from the country of his habitual residence, the district court must order the child returned.[1]  *See id.*  Therefore, in order to prevail, Reyes had to prove that:  (1) the child was "habitually resident" in Guatemala at the time Perez removed him to the United States; (2) the removal was in breach of Reyes's custody rights under Guatemalan law; and (3) Reyes was exercising those rights at the time of removal.  *See Ruiz v. Tenorio*, 392 F.3d 1247, 1251 (11th Cir. 2004).  Although the Hague Convention lacks a definition for "habitual residence," "[c]ourts have been instructed to interpret the expression according to the ordinary and natural meaning of the two words it contains" and decide a child's habitual residence "by reference to all the circumstances of a particular case."  *Id.* at 1252 (internal quotation marks omitted).  Although generally an infant's habitual residence can be discerned based on the parents' shared intent, where "the parents' relationship has broken down" through a "conflict [that] is contemporaneous with the birth of the child, no habitual residence may ever come into existence" based on the parties' shared intent.  *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003).

In its order granting Reyes's petition, the district court concluded that Reyes and Perez never shared an intent to reside in Florida or Guatemala and that the child's only habitual residence was in Guatemala with his mother.  The district court further found that Perez's removal of E.L. was in breach of Reyes's custody

---

[1] This rule is subject to a number of affirmative defenses, none of which Perez argues applies here.

8

rights under Guatemalan law, which rights Reyes was exercising at the time of E.L.'s wrongful removal.  Thus, the district court ruled, the Hague Convention required that E.L. be returned to Reyes.

Perez challenges the first and second Hague Convention elements.  As to the first element, he asserts that the district court erred in determining that the parents had never formed a shared intent to live in Florida such that the child's habitual residence was Guatemala.  As to the second element, Perez contends the district court's conclusion that Reyes had custody of E.L. under Guatemalan law was erroneous because it was based on a flawed affidavit from Reyes's Guatemalan attorney.  Finally, Perez argues the district court violated his right to due process by denying him a fair opportunity to be heard at a meaningful time and in a meaningful manner.  We address these arguments in turn.

## A. The district court did not err in determining that E.L.'s habitual residence was Guatemala.

Perez mounts two challenges to the district court's conclusion that E.L.'s habitual residence was Guatemala.  First, Perez asserts that the district court overlooked evidence that he and Reyes shared an intent to reside in Florida, thereby making Florida the child's habitual residence.[2]  Second, Perez asserts that

[2] Perez relatedly contends that the district court erred as a matter of law in concluding that E.L. had no habitual residence for the first two months of his life, arguing that if Guatemala was not the child's habitual residence at that time, Florida necessarily was.  There is no support in the Hague Convention or our case law for the proposition that an infant must have an identifiable habitual residence from the time of birth.  Indeed, as the Third Circuit has explained,

9

he never consented to the child living in Guatemala, so Guatemala could not have been the child's habitual residence.  We reject both of these arguments.

We cannot agree that the district court erred in determining that Reyes never formed an intent to reside in Florida.  The parties' testimony was in conflict with regard to Reyes's intentions when she moved to Florida.  The district court resolved the conflict in favor of Reyes—finding that she had no settled intent to raise E.L. in Florida—and we see no clear error in that finding.  The district court found that although Perez and Reyes had discussed marriage, they never announced an engagement.  Crucial to the court's finding was the fact that Reyes was in Florida on a tourist visa that only permitted her to stay in the country for six months at a time.  Aside from one meeting with an immigration attorney, neither Reyes nor Perez took any steps to change Reyes's immigration status.  In concert with her temporary immigration status, Reyes left virtually all of her possessions— including her pets—in Guatemala, and she made no plans to sell or close her business there.  The evidence showed that Reyes only remained in Florida after the birth of E.L. because her midwife advised her to wait to ensure E.L.'s health, and she had to wait for E.L.'s passport to issue.  In short, ample evidence—much of it

---

an infant may indefinitely lack a habitual residence if the parents' relationship breaks down "contemporaneous with the birth of the child."  *Delvoye*, 329 F.3d at 333.

undisputed—supported the district court's finding that Reyes had no intent to raise E.L. in Florida; the district court's findings were not clearly erroneous.

With respect to the district court's conclusion that Florida was not E.L.'s habitual residence, *Ruiz* is on point. There, the court found that the parents had no settled intent to reside in Mexico where the "numerous objective facts" indicated that the mother's "intent with respect to the move to Mexico was clearly conditional." *Ruiz*, 392 F.3d at 1254. The mother "retained bank accounts and credit cards in the United States; [] had her American mail forwarded to an American address and not to Mexico; and [] moved her nursing license to Florida shortly after [] mov[ing] to Mexico." *Id*. Reyes's behavior here creates an equally strong—if not stronger—inference that there was no settled intent to raise E.L. in Florida. Like the mother in *Ruiz*, Reyes's actions demonstrate that she moved to Florida for "a trial period," and nothing more. *Id*; *see also Chafin v. Chafin*, 742 F.3d 934, 939 (11th Cir. 2013) (affirming the district court's conclusion that the United States was not the child's habitual residence where the mother "came to the United States in February, 2010 on a ninety-day visitor visa that is only issued with proof of a return ticket" and "maintained her residence in Scotland and did not cancel [the child's] planned enrollment in Scottish school when she came to Alabama").

11

Moreover, this case contrasts starkly with situations where we have found a settled intent to reside in a particular location.  For example, in *Seaman*, we affirmed the district court's finding that the parties had a settled intent to raise their child in Mexico where they "sold their possessions in Georgia and took up their own dwelling in Mexico," "enrolled the children in Mexican schools when they reached the appropriate age," "were absent from the United States from a residential standpoint for more than four years, returning to the United States only a few times for visits of limited duration," and "established legal, temporary residence in Mexico."  *Seaman*, 766 F.3d at 1258.  Despite the duration of the parties' residency in Mexico and the fact that they sold their possessions in Georgia, we nevertheless noted that *Seaman* was a "close and difficult case."  *Id*. at 1261.  Here, by contrast, Reyes stayed only briefly in the United States after the E.L.'s birth, and her possessions and business remained in Guatemala.  To the extent *Seaman* was a close call, in this case it is clear:  the parties had no settled intent to raise E.L. in Florida.[3]

The cases Perez cites do nothing to alter this conclusion.  Perez first cites to a passage from *Mozes v. Mozes*, 239 F.3d 1067, 1077 (9th Cir. 2001), noting that courts are "generally unwilling to let one parent's alleged reservations about the

---

[3] On appeal, Perez argues only that the parties' shared intent established E.L.'s habitual residence in Florida.  He does not argue that E.L.'s acclimatization or contacts in Florida during his brief time there established Florida as E.L.'s habitual residence.

12

move stand in the way of finding a shared and settled purpose." But *Mozes* explicitly qualified this language, limiting it to circumstances where "a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another." *Id.* Here, the district court's finding that Reyes did not take "all the steps associated with abandoning" her residence in Guatemala was well supported by evidence. Equally unhelpful to Perez is *Feder v. Evans-Feder*, 63 F.3d 217 (3d Cir. 1995), in which the court held that Australia was the child's habitual residence where the parents "purchased and renovated a house, pursued interests and employment, and arranged for [the child's] immediate and long-term schooling" in Australia, notwithstanding the mother's reservations. *Id.* at 224. Reyes took no similar steps in Florida.

The district court also properly found—and Reyes does not contest—that the parties had no settled intent to raise E.L. in Guatemala. Therefore, the question is whether the district court properly found that E.L. became habitually resident in Guatemala before Perez removed E.L. to Florida. We conclude that it did. We are persuaded by the district court's reliance on *Kijowska v. Haines*, 463 F.3d 583 (7th Cir. 2006), which featured a similar fact pattern. There, shortly after the child's birth in the United States, the mother removed the child to Poland. *Id.* at 586. The father then obtained an ex parte custody order from an Illinois state court. *Id.* When the mother returned to the United States attempting to reconcile with the

13

father, the father falsely informed an immigration officer that the mother intended to overstay her visa. *Id.* The officer let the father take the child, forcing the mother to return to Poland. *Id.* In determining the child's habitual residence, the Seventh Circuit explained that the father had circumvented available legal remedies by wrongfully abducting the child:

> Suppose that [the child's] habitual residence when her mother took her to Poland in December 2004 was the United States and that [the mother's] removal of her was wrongful. [The father's] remedy would have been to file a petition under the Hague Convention and its implementing federal statute. He did not do that. He merely sought a custody order from an Illinois state court and then used that order to help obtain the self-help remedy of taking the child from the airport. To give a legal advantage to an abductor who has a perfectly good legal remedy in lieu of abduction yet failed to pursue it would be contrary to the Hague Convention's goal of discouraging abductions by denying to the abductor any legal advantage from the abduction. By failing to pursue his legal remedy, [the father] enabled [the child] to obtain a habitual residence in the country to which her mother took her, even if the initial taking was wrongful.

*Id.* at 588–89.

So too here. Perez voluntarily left Guatemala after he was informed that neither Reyes nor E.L. would return to the United States. Instead of following the procedures outlined by the Hague Convention, Perez initiated a custody proceeding in the United States, received a favorable outcome, and engaged in self-help by returning to Guatemala and abducting E.L.[4] As in *Kijowska*, Perez's failure to

---

[4] Even had E.L. been in Florida, the Pick Up Order that Perez received from a Florida state court permitted law enforcement—not Perez himself—to bring E.L. to Perez.

14

"pursue his legal remedy" under the Hague Convention weighs in favor of finding that E.L's habitual residence was in Guatemala.

The district court also properly considered E.L.'s settlement in Guatemala in determining that it was E.L.'s habitual residence. "Where a child is born while his . . . mother is temporarily present in a country other than that of her habitual residence it does seem, however, that the child will normally have no habitual residence until living in a country on a footing of some stability." *Delvoye*, 329 F.3d at 334 (alteration in original) (internal quotation marks omitted). "[T]he Convention is concerned with the situation where the child is taken out of the family and social environment in which its life has developed." *Holder v. Holder*, 392 F.3d 1009, 1019 (9th Cir. 2004) (internal quotation marks omitted).[5] Here, the district court properly relied on a number of factors in determining that E.L. was living in Guatemala with some stability, including the facts that E.L. was: living in a house with his mother, grandparents, and uncle, with whom he was bonding; regularly seen by a pediatrician in Guatemala; to be baptized in Guatemala; and

---

[5] *Holder* concerned children who had a previous habitual residence. 392 F.3d at 1014-15. The question was whether children became sufficiently acclimatized in a new country such that the new country displaced the original country as the children's habitual residence. *Id.* In such circumstances, we have held that "courts should be slow to infer from [contacts in the new location] that an earlier habitual residence has been abandoned." *Ruiz*, 392 F.3d at 1253-54 (internal quotation marks omitted). In this case, because we conclude that Florida was never E.L.'s habitual residence, the scales are not tipped in favor of Perez, as they would be had we determined otherwise.

15

regularly attending church with Reyes and her family.  Moreover, Perez repeatedly sent money to Guatemala to support E.L. and visited the child in Guatemala multiple times prior to the abduction.[6]  Were any greater quantum of contacts with a particular location required to establish an initial habitual residence, parents could freely engage in a continuous game of abduction ping pong, given the many months or even years in which they could freely abduct the child before any particular location became the child's habitual residence.  This is contrary to the purposes of the Hague Convention.  We therefore conclude, as did the district court, that at the time E.L. was abducted, his habitual residence was in Guatemala.

## B.  The district court did not err in determining that Reyes had custodial rights over E.L. under Guatemalan law.

Perez next argues that the district court erred in determining that Reyes had custody rights under Guatemalan law.  He quibbles with the district court's failure to view "more skeptically" the affidavit of Reyes's counsel, which described Guatemalan custody law and Reyes's rights thereunder.  Perez Brief at 26.  According to Perez, "the [district] court accepted this [affidavit] even though [Reyes] testified that the *same lawyer* told her to lie in the Guatemalan court proceedings."  *Id.*  We are unpersuaded that the district court so erred.  Critically,

---

[6] Perez argues that the district court improperly found that he consented to Guatemala being E.L.'s habitual residence.  But the district court never made such a finding; instead the court cited to Perez's behavior as one piece of evidence among many indicating that Guatemala had become E.L.'s habitual residence.

in its order granting Reyes's petition, the district court nowhere relied on the affidavit regarding Guatemalan law that Reyes's counsel supplied.

Instead, the district court relied on the Hague Convention, Guatemala's Civil Law Code, and a series of federal cases construing the Hague Convention's parental rights provisions. Perez argues that the district court's construction of these sources was erroneous. Specifically, he asserts that the district court improperly rejected the assessment of Guatemalan law provided by a Guatemalan attorney on Perez's behalf. We disagree.

As the district court explained, Article 252 of the Civil Law Code of Guatemala grants parental power over minor children jointly to a married mother and father, and in any other case to the parent in whose power the child is. Because Reyes and Perez were not married, the question becomes: in whose power was E.L. at the time he was removed to the United States? Article 261 of the Civil Law Code notes that children shall be in the power of the mother where the mother is unwed, unless both parents agree that the father should have custody. Consequently, the district court properly determined that under Guatemalan law Reyes had custodial rights over E.L. sufficient to render Perez's removal of E.L. unlawful.

The attorney's affidavit Perez submitted did not quarrel with the conclusion that if the Civil Law Code applied, Reyes had custodial rights over E.L. Instead,

17

the affidavit asserted that the Civil Law Code did not apply to E.L. because E.L. was not "registered" in Guatemala.  The problem with the affidavit is that it provided no primary source Guatemalan law—either in the form of statutes or case law—to support the proposition that the Civil Law Code does not apply to unregistered children.  While the affidavit repeatedly cited (and provided translated text of) law indicating that Guatemalan parents must register their children within 60 days of birth, none of the law cited in the affidavit makes application of the Civil Law Code contingent on registration.  Indeed, the law Perez provided (which the affidavit labeled Registration At The Vital Records, Articles 67-73) explicitly identified the consequences of failing to register:  "The lack of registration before the Office of Vital Records prevents the individual from obtaining a Personal [] Identification Card and the issuance of any certification by [Guatemala's registration agency]."  Aff. of Frank Rigoberto de León Ortiz (Doc. 43-1).[7]  This language affords us no basis to reject application of the Civil Law Code.

Perez protests that construing Guatemalan law in the way Reyes suggests would permit single Guatemalan mothers to abduct their children and bring them to Guatemala, whose courts would automatically grant them custody.  But the Hague Convention prevents Perez's slippery slope from manifesting.  Where a child is removed from his habitual residence and taken to Guatemala, the Hague

---

[7] Citations to "Doc." refer to docket entries in the district court record in this case.

18

Convention mandates that the child be returned to his habitual residence for a custody determination. Where a child has no previous habitual residence and the mother removes the child to Guatemala—as happened here—a Guatemalan court is only empowered by the Hague Convention to determine each parent's custodial rights if the child has become habitually resident in Guatemala. If the child has become habitually resident in Guatemala, then Guatemala is the Hague Convention's preferred forum. If the child has no habitual residence in any location, then there is no alternative forum that necessarily would be preferable to Guatemala, and Perez's complaint is simply that he finds Guatemalan law unfavorable. In short, Perez's assertions are unfounded. In this case, Guatemala is empowered to make the custody determination—and Perez's removal of E.L. was unlawful—because E.L. was habitually resident in Guatemala at the point when he was removed.[8]

We therefore uphold the district court's determination that Reyes had custodial rights over E.L. in Guatemala.

### C. The district court did not violate Perez's due process rights.

---

[8] Perez also argues that the district court improperly made a final determination that Reyes should have custody of E.L. The district court did no such thing, instead properly recognizing that once E.L. was returned to Guatemala, "the parties will be able to pursue legal custody proceedings in accordance with the laws of Guatemala." Order at 23. The district court found only that Reyes had some custodial rights under Guatemalan law such that Perez's removal of E.L. was unlawful under the Hague Convention.

19

Finally, Perez argues that the district court violated his due process rights by giving him only seven days to prepare for an evidentiary hearing. This argument is meritless. "The court's inquiry is limited to the merits of the abduction claim and not the merits of the underlying custody battle." *Ruiz*, 392 F.3d at 1250. "The [C]onvention is intended as a rapid remedy for the left-behind parent to return to the status quo before the wrongful removal or retention." *Id.* (internal quotation marks omitted). Consequently, "Article 11 of the Convention provides [t]he judicial . . . authorities of Contracting States shall act *expeditiously* in proceedings for the return of children." *West v. Dobrev*, 735 F.3d 921, 929 (10th Cir. 2013) (alterations in original) (internal quotation marks omitted). To facilitate the goal of expediency, "a district court has a substantial degree of discretion in determining the procedures necessary to resolve a petition filed pursuant to the Convention and ICARA." *Id.* "Specifically, neither the Convention nor ICARA, nor . . . the Due Process Clause of the Fifth Amendment[] requires that discovery be allowed or that an evidentiary hearing be conducted as a matter of right in cases arising under the Convention." *Id.* (internal quotation marks omitted); *see also March v. Levine*, 249 F.3d 462, 474 (6th Cir. 2001) (noting that the Hague Convention "requires not only expeditious action by courts under article 11 . . . but use of the most expeditious procedures available" (internal quotation marks omitted)).

20

Although this court has not yet assessed the interaction between the Hague Convention's demand for expediency and due process rights, we are persuaded by the Tenth Circuit's approach in *West*. There, the district court possessed the petition, the respondent's answer to the petition, and the affidavit of a psychologist (provided by the respondent) who had interviewed the children at issue and noted possible child abuse on part of the petitioner. *West*, 735 F.3d at 926-27. The psychologist refused to testify at a hearing, so the respondent asked the court to appoint a psychologist to interview the children. *Id.* at 927-28. The court declined to do so, found that no evidentiary hearing was necessary, and ordered the respondent to return the children to the petitioner. *Id.* at 928-29.

On appeal, the Tenth Circuit held that the respondent's due process rights had not been violated. In doing so, the court noted that the respondent was not entitled to "what appears . . . under the totality of the facts presented [to be] a 'fishing expedition.'" *Id*. at 932. "To condone Respondent's efforts would sabotage the underlying premise of the Convention, *i.e.,* that wrongfully removed or retained children be promptly returned to their country of habitual residence, . . . so that a court there may resolve custody-related questions in the best interests of the children." *Id*. Ultimately, the court reasoned that the respondent "received a meaningful opportunity to be heard," which is "all due process requires in the context of a Hague Convention petition." *Id*.

Here, the district court conducted fact-finding substantially more robust than the district court in *West*. Instead of relying on written submissions alone, the district court held a four day evidentiary hearing. At the hearing, Perez was permitted to enter documentary evidence, call witnesses, and cross examine Reyes's witnesses. Although Perez protests that he was unable to locate certain witnesses or obtain certain documentary evidence in time, he was given a five day continuance, and he never identifies what these witnesses' likely testimony would have been or what that evidence might have shown. Moreover, even if he had, as *West* demonstrates, the perfect cannot be the enemy of the good in assessing Hague Convention petitions. Like the respondent in *West*, Perez "received a meaningful opportunity to be heard," satisfying his due process rights.[9]

## IV.    CONCLUSION

For the foregoing reasons, we affirm the district court's order.

**AFFIRMED.**

---

[9] To the extent Perez argues that the district court violated his due process rights by setting a hearing for transfer of E.L. too soon after its ruling or by reading from prepared remarks in rejecting Perez's Emergency Motion to Stay, we reject these arguments as meritless.

22