[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-14122

_____

D.C. Docket No. 9:18-cv-80236-RLR

JOSE CANDIDO DIAZ PALENCIA,

Petitioner - Appellee,

versus

MARILIS YANETH VELASQUEZ PEREZ,

Respondent - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 30, 2019)

Before JORDAN, NEWSOM, and BRANCH, Circuit Judges.

JORDAN, Circuit Judge:

In this case—filed pursuant to the Hague Convention on the Civil Aspects of

International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S.

89, implemented by the International Child Abduction Remedies Act, 22 U.S.C. §§ 9001 *et seq.*—the district court concluded that Marilys Velasquez Perez had wrongfully retained her son, H.J.D.V., in the United States and away from Guatemala, his place of habitual residence.  It therefore granted the petition filed by H.J.D.V.'s father, Jose Diaz Palencia, and ordered that the child be returned to Guatemala.

Ms. Perez appeals, challenging a number of the district court's rulings. Following review of the record, and with the benefit of oral argument, we affirm.[1]

## I

We present the relevant facts as found by the district court following two evidentiary hearings.  To the extent other facts are necessary, we set them out where pertinent to our discussion.

## A

Ms. Perez and Mr. Palencia began dating about 10 years ago.  In August of 2012, they participated in a commitment ceremony in Guatemala before their community, families, and friends, and publicly declared their love for each other.

---

[1] All of the translations from Spanish to English in this opinion have been provided by Joshua Elliott, a federally-certified court interpreter and the supervisor of the Interpreters Section of the United States District Court for the Southern District of Florida. We are extremely grateful to Mr. Elliott for his assistance.

Following the ceremony, they lived together in Ms. Perez's familial home in Guatemala.

The commitment ceremony did not take place before a mayor, notary, or court. As a result, it is not recognized under Guatemalan law as a formal, non-marital union or union-in-fact (i.e., a recognized common-law marriage).

Ms. Perez and Mr. Palencia have never been married, but they had a child, H.J.D.V., who was born in Guatemala in 2013. The three of them lived as a family in the home of Ms. Perez's parents for two years, until they moved into a separate home on the same property. They lived there together until Ms. Perez left with H.J.D.V. in October of 2016.

Mr. Palencia is an agricultural worker, and he paid for H.J.D.V.'s clothing, food, and medical care in Guatemala. He also provided day-to-day care for H.J.D.V. when he was not working. Ms. Perez did not work outside the home while the family resided in Guatemala.

In October of 2016, Ms. Perez told Mr. Palencia that she wanted to take H.J.D.V. to Chiapas, Mexico, to visit relatives for a week. Mr. Palencia did not object, as Ms. Perez had twice visited Chiapas with H.J.D.V. and returned to Guatemala. Ms. Perez never indicated that she intended to take H.J.D.V. to the

3

United States, and Mr. Palencia never agreed to her doing so. Nor did he agree to Ms. Perez taking H.J.D.V. away for longer than a week.[2]

Rather than visiting Mexico, Ms. Perez took H.J.D.V. to the United States, where they were detained at the border. Mr. Palencia only learned of their whereabouts 12 days later, when Ms. Perez called him from a detention facility in the United States. She told Mr. Palencia that she had made a mistake, asked for forgiveness, and said that she would return to Guatemala with H.J.D.V. She explained that, to be able to return, she needed Mr. Palencia's assistance in obtaining passports for herself and H.J.D.V. Mr. Palencia cooperated. It took months for the passports to be issued, during which time Ms. Perez repeatedly told Mr. Palencia she would return as soon as she had them. In July of 2017, after she had received the passports, Ms. Perez told Mr. Palencia she would not be returning to Guatemala with H.J.D.V.

Unbeknownst to Mr. Palencia, Ms. Perez had filed an asylum application for herself and H.J.D.V. upon arriving in the United States. Mr. Palencia did not learn of the application until after he filed his Hague Convention petition in the district court. Ms. Perez did not tell Mr. Palencia that she had sought asylum for H.J.D.V., and he never agreed to her doing so. In connection with her asylum application, Ms.

---

[2] H.J.D.V. did not have a passport at the time of the trip. Mr. Palencia did not believe he required a passport, as he and Ms. Perez had previously traveled with H.J.D.V. to Chiapas without one.

Perez completed a credible fear interview, in which she stated that she had never suffered violence at a romantic partner's hands.

**B**

On February 25, 2018, Mr. Palencia filed a verified Hague Convention petition seeking H.J.D.V.'s return. On April 30, 2018, the district court held an evidentiary hearing and heard testimony from a number of witnesses, including Ms. Perez and some of her family members, Mr. Palencia and his family members, and certain mental health professionals and advocates. The parties agreed to continue the hearing to give them a chance to submit additional evidence, and on August 27, 2018, the district court held a second evidentiary hearing. At that second hearing it heard from, among others, two Guatemalan attorneys—one proffered by each party. On September 20, 2018, the district court granted Mr. Palencia's petition and ordered that H.J.D.V. be returned to Guatemala.

Ms. Perez asserts that the district court committed several errors. We address two of her arguments. The first is that the district court erred in its determination of Guatemalan law with respect to Mr. Palencia's rights. The second is that the district court wrongfully concluded that July of 2017—when Ms. Perez informed Mr.

Palencia that she would not return to Guatemala—constituted the date of H.J.D.V.'s wrongful retention.[3]

## II

The Hague Convention "was adopted in 1980 to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Hanley v. Roy*, 485 F.3d 641, 644 (11th Cir. 2007) (internal quotation marks omitted) (quoting Convention, pmbl.). The United States has implemented the Convention through the ICARA, 22 U.S.C. § 9001 *et seq.*

The Convention and, by extension, the ICARA, "empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims." 22 U.S.C. § 9001(b)(4). "The Convention generally intends to restore the pre-abduction status quo[.]" *Hanley*, 485 F.3d at 644. Our inquiry is therefore "limited to the merits of the abduction claim[.]" *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004) (citation omitted).

---

[3] As to Ms. Perez's two other arguments, we affirm without extended discussion. The district court did not abuse its discretion in admitting certain testimony and evidentiary materials. And, given its credibility findings, the district court did not err in concluding that Ms. Perez had not proven that returning H.J.D.V. to Guatemala would pose a grave risk of harm.

**A**

Children who are wrongfully removed or retained "are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4). The removal or retention of a child from a signatory state is wrongful where

> a) it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was habitually resident immediately before the removal or retention; and
>
> b) at the time of removal or retention those rights were actually exercised . . . or would have been so exercised but for the removal or retention.

Convention, Art. 3. *See also Ruiz*, 392 F.3d at 1251. The petitioner in a Hague Convention case bears the burden of proving by a preponderance of the evidence that the child was wrongfully removed or retained. *See* 22 U.S.C. § 9003(e)(1)(A); *Chafin v. Chafin*, 742 F.3d 934, 938 (11th Cir. 2013).

To prove wrongful retention, the petitioner must show that (1) the child was a habitual resident of another signatory country at the time of the retention; (2) the retention was in breach of his or her rights of custody under the law of that country; and (3) he or she was exercising those rights at the time of the retention, or would have been but for the wrongful retention. *See Chafin*, 742 F.3d at 938; *Furnes v. Reeves*, 362 F.3d 702, 712 (11th Cir. 2004) (citing Convention, Arts. 3 & 5, as well as 22 U.S.C. § 9003(e)(1)(A)), *abrogated on other grounds by Lozano v. Montoya*

7

*Alvarez*, 572 U.S. 1 (2014)). The parties here disagree about the second element of a wrongful retention claim—whether Mr. Palencia had any rights of custody under Guatemalan law at the time of H.J.D.V.'s retention.

The term "rights of custody" does not have a fixed definition, but it is not limited to physical custody. The Hague Convention takes an expansive view of the concept, explaining that "'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence[.]" Convention, Art. 5(a).

The Convention's intent is for courts to "invoke[ ] in the widest possible sense" the law of the child's habitual residence. Elisa Pérez-Vera, Explanatory Report on the 1980 Hague Convention on the Civil Aspects of International Child Abduction ¶ 67 (1982). We confirmed this understanding in *Hanley*, where we said that "[t]he intention of the Convention is to protect *all* the ways in which custody of children can be exercised, and the Convention favors a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." 485 F.3d at 645 (emphasis in original and internal quotation marks and citations omitted). "[T]he violation of a *single* custody right suffices to make removal . . . wrongful. . . . [A] parent need not have 'custody' to be entitled to return [of the child]; rather, he need only have one right of custody." *Id.* at 647 (emphasis in original and citation omitted).

8

**B**

We look to the law of Guatemala, the country of H.J.D.V.'s habitual residence, to "determine the content of [Mr. Palencia's] right[s], while following the Convention's text and structure to decide whether the right at issue is a 'right of custody.'" *Abbott v. Abbott*, 560 U.S. 1, 10 (2010). *See also Hanley*, 485 F.3d at 645 ("'[R]ights of custody' are determined by the law of the country in which the child habitually resides at the time of removal[.]") (footnote omitted). The district court's determination of Guatemalan law is subject to plenary review, and in performing that review we can conduct our own research of relevant sources. *See* Fed. R. Civ. P. 44.1; *Animal Science Prods., Inc. v. Hebei Welcome Pharm. Co. Ltd.*, 138 S. Ct. 1865, 1869–70 (2018).

Guatemala is a civil law jurisdiction. The generally recognized sources of law in such a jurisdiction are constitutional provisions, statutes, administrative regulations, and customs. *See generally* John Henry Merryman & Rogelio Perez-Perdomo, The Civil Law Tradition: An Introduction to the Legal Systems of Europe and Latin America (4th ed. 2019). According to the expert testimony presented in the district court, Guatemala's judicial system of cassation requires five serial, uniform decisions by Guatemalan Supreme Court before jurisprudence will be considered alongside these sources in deciding a matter. *See* D.E. 142 at 86–87.

9

Because there are not five such decisions on the issue we confront, Guatemalan caselaw (to the extent it exists) does not provide us with any authoritative guidance.

Ms. Perez argues that Mr. Palencia, whom she never married, lacks "rights of custody" under Article 261 of the Guatemalan Civil Code.  Article 261 provides in relevant part as follows: "**Single or separated mother.** When the father and the mother are neither married nor in a common-law marriage, the children shall be in the mother's custody unless she agrees to transfer them to the father's custody, or unless they are enrolled in a boarding school." Guatemalan Civil Code, Chapter VII, Art. 261 ("**Madre soltera o separada.**  Cuando el padre y la madre no sean casados ni estén unidos de hecho, los hijos estarán en poder de la madre, salvo que ésta convenga en que pasen a poder del padre, o que sean internados en un establecimiento de educación. . . .").

According to Ms. Perez, Article 261 grants her exclusive *patria potestad* powers and, therefore, complete custodial authority as to H.J.D.V.  *Patria potestad* is a Roman legal concept which, in its original form, gave a family patriarch absolute power over his child, but is now generally understood to be the rights any biological parent may exercise over a child.  *See Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 346 (D. Md. 2017) (discussing *patria potestad* in the context of Guatemalan law).

10

Articles 252 and 254 of the Code discuss the concept of *patria potestad.* Under Article 252, "within a marriage or common-law marriage" *patria potestad* "is exercised jointly by the father *and* the mother over minor children," and "in any other case, it is exercised by the father *or* the mother, depending on who has custody of the child."  Guatemalan Civil Code, Chapter VII, Art. 252 (emphasis added) ("**En el matrimonio y fuera de él.**  La patria potestad se ejerce sobre los hijos menores, conjuntamente por el padre y la madre en el matrimonio y en la unión de hecho; y por el padre o la madre, en cuyo poder esté el hijo, en cualquier otro caso.").  And under Article 254, *patria potestad* encompasses "the right to legally represent a minor or disabled person in any civil procedure; to manage his or her assets; and to make good use of his or her services according to his or her age and condition."  Guatemalan Civil Code, Chapter VII, Art. 254 ("**Representación del menor o incapacitado.**  La patria potestad comprende el derecho de representar legalmente al menor o incapacitado en todos los actos de la vida; administrar sus bienes y aprovechar sus servicios atendiendo a su edad y condición.").  As summarized by one district court, although the concept of *patria potestad* is not explicitly defined in the Code, it "covers [among other things] 'the right to legally represent a minor . . . in all civil acts . . . to administer his or her assets and to take advantage of available services in view of his or her age and condition.'"  *Luis Ischiu*, 274 F. Supp. 3d at 346 (quoting translation of Article 254).

11

Even assuming that Articles 261 and 254 grant Ms. Perez comprehensive *patria potestad* powers and primary custody over H.J.D.V., we conclude that a father in Mr. Palencia's situation nevertheless retains certain rights and responsibilities under Guatemalan law. In our view, Article 253 establishes certain inalienable responsibilities for both parents of a child, even when the two are neither married nor in a formal union-in-fact. It provides as follows: "**Duties of both parents.** The father and the mother have a duty to care and provide for their children, whether born in or out of wedlock, and to raise and correct them using measured discipline. In accordance with criminal law, both shall be responsible should they leave them in a state of moral and/or material abandonment and fail to fulfill the duties inherent to parental authority." Guatemalan Civil Code, Chapter VII, Art. 253 ("**Obligaciones de ambos padres.** El padre y la madre están obligados a cuidar y sustentar a sus hijos, sean o no de matrimonio, educarlos y corregirlos, empleando los medios prudentes de disciplina, y serán responsables conforme a las leyes penales si los abandonan moral o materialmente y dejan de cumplir los deberes inherentes a la patria potestad.").

In civil law jurisdictions like Guatemala, the interpretations of legal scholars are given significant weight in determining the meaning of statutory provisions. *See* Merryman & Perez-Perdomo, The Civil Law Tradition at 61–62. *See also V. Suarez & Co., Inc. v. Dow Brands, Inc.*, 337 F.3d 1, 8 (1st Cir. 2003). According to one

Guatemalan legal scholar, "the task of the non-custodial parent does not consist of mere supervision . . . but rather he or she maintains his or her parental role and has a right to take on an active position that involves collaborating with the custodial parent in terms of raising, protecting, and assisting the minor." Mayra Aurelia Flores Morales, La Inadecuada Enunciación de Patria Potestad y la Necesidad de Incorporar a la Legislación Guatemalteca la Expresión Relaciones Paterno Filiales, Por Su Más Amplio Contenido 33 (2010) ("La labor de quien no tiene la tenencia de los hijos no es de mera supervisión, . . . sino que conserva su rol parental y tiene derecho a tomar una posición activa que implica colaborar con el titular de la guarda en la función de educación, amparo y asistencia del menor."). *See also* Alfonso Brañas, Manual de Derecho Civil 232–33 (1998) (explaining that, with respect to the exercise of *patria potestad*, the Guatemalan Civil Code speaks of both rights and obligations, and it is difficult to distinguish clearly between rights and obligations given the ambit of human behavior: "En realidad, y en vista de la peculiar naturaleza de la institución, resulta difícil deslindar claramente, en este ámbito de la conducta humana, íntimo de por sí, lo que es simple deber de lo que es obligación propiamente dicha, y aún lo que es un derecho en el estricto sentido de la palabra.").[4]

---

[4] We have not located any Guatemalan authorities to the contrary, and Ms. Perez has not pointed us to any.

13

Our task is to decide this case "in accordance with the Convention." 22 U.S.C. § 9003(d). Article 5(a) of the Convention expressly includes "rights relating to the care of the person of the child" as "rights of custody," and both parties' experts agreed that Article 253 confers obligations on both parents. *See* D.E. 144 at 27–28. The interpretation of Ms. Flores Morales, which speaks of the "right" of a non-custodial parent with respect to raising, protecting, and assisting the child, indicates (or at least strongly suggests) that Mr. Palencia has "rights of custody" under the Hague Convention with respect to H.J.D.V. pursuant to Article 253. By virtue of his obligation to care for, support, educate, and discipline his son—an obligation whose breach is punishable by criminal sanctions—Mr. Palencia was "endowed with joint decision-making authority" over important aspects of H.J.D.V.'s life, and he was "indisputably exercis[ing] [his] rights to care and to provide" for his son prior to the wrongful retention. *See Hanley*, 485 F.3d at 646–48 (holding that, under Irish law, a guardian has rights of custody within the meaning of the Hague Convention, even though some decisions are entirely outside the guardian's power, because a guardianship "encompasses the duty to maintain and properly care for a child and the right to make decisions about a child's religion and secular education, health requirements and general welfare") (internal quotation marks and citation omitted).

Ms. Perez contends that any reading of Article 253 which recognizes rights of custody under the Hague Convention for unwed fathers "renders Article 261

completely meaningless and unnecessary." Appellant's Br. at 14. Not so. As we read and understand the two provisions, Article 253 provides an unmarried father with certain obligations (and therefore certain rights) with respect to his child, with the caveat that Article 261 gives the mother the final say when the parents disagree on a given issue.

Ms. Perez also relies on our unpublished decision in *Ovalle v. Perez*, 681 F. App'x 777, 784–86 (11th Cir. 2017), which held that an unmarried mother had rights of custody within the meaning of the Hague Convention under Guatemalan law. But our decision today does not conflict with *Ovalle*. The panel in *Ovalle* addressed the rights of custody of an unmarried mother—not those of an unmarried father like Mr. Palencia—under Guatemalan law, and it naturally turned to Article 261 to answer that particular question. Because the panel in *Ovalle* addressed only whether the unmarried mother had rights of custody, it had no need to consider Article 253. Our inquiry concerns the rights of the unmarried father, so Article 253 becomes relevant.

It may well be that a Guatemalan court will ultimately grant full custody of H.J.D.V. to Ms. Perez. But a custody determination is outside our purview. We hold only that the district court correctly ruled that Mr. Palencia is endowed with rights of custody under Article 5 of the Hague Convention pursuant to Article 253 of the Guatemalan Civil Code.

15

## III

We turn next to Ms. Perez's argument concerning the date of the wrongful retention. That date matters because, if a petition for return is filed more than one year after the wrongful retention (or, indeed, removal), the Convention permits the parent who took the child to argue that return should not be ordered because the child is "now settled" in his or her new environment. *See* Convention, Art. 12; *Lozano*, 572 U.S. at 4–5.

Mr. Palencia filed his petition in February of 2018. The district court ruled that the wrongful retention took place in July of 2017 (when Ms. Perez told Mr. Palencia that she would not be returning to Guatemala with H.J.D.V.) and not in October of 2016 (when Ms. Perez left Guatemala with the child and told Mr. Palencia that she was going to Mexico for a week to visit family members). *See* D.E. 144 at 23. The district court reasoned that the wrongful retention could not have occurred in October of 2016 because at that time Mr. Palencia had consented to Ms. Perez and H.J.D.V. traveling to Mexico for a week, and he had no reason to demand the child's return. The district court, we conclude, got it right.

We have not previously addressed whether, for the purpose of determining the date of wrongful retention, a court should look to the date the abducting parent formed the intent to wrongfully retain the child or to the date the petitioning parent

16

learned the true nature of the situation.  We hold today that, in a case like this one, the latter is the appropriate date.

In *Marks on behalf of SM v. Hochhauser*, 876 F.3d 416, 417, 420–23 (2d Cir. 2017), the Second Circuit held that the wrongful retention occurred when the custodial parent told the non-custodial parent that she would be staying in the United States with their children and would not be returning to the country of the child's habitual residence.  The First Circuit reached the same conclusion in *Darin v. Olivero-Hoffman*, 746 F.3d 1, 10–11 (1st Cir. 2014). And in *Blackledge v. Blackledge*, 866 F.3d 169 (3d Cir. 2017), the Third Circuit similarly looked to the date the non-custodial parent's consent expired.  It explained that "the retention date is the date beyond which the noncustodial parent no longer consents to the child's continued habitation with the custodial parent and instead seeks to reassert custody rights, as clearly and unequivocally communicated through words, actions, or some combination thereof."  *Id.* at 179.  In each of these cases, although the petitioning and non-custodial parent initially assented to the child's removal from the country of habitual residence, the date consent was revoked constituted the date of wrongful retention.

We agree with our sister circuits and note that the case for such a rule is even stronger where—as here—the custodial parent makes affirmative representations regarding the date of the child's return and then fails to act in accordance with them.

17

"Wrongful retentions typically occur when a parent takes a child abroad promising to return with the child and then reneges on that promise[.]" *Redmond v. Redmond*, 724 F.3d 729, 738 n.5 (7th Cir. 2013).

When Ms. Perez and H.J.D.V. traveled to the United States and were detained at the border, Ms. Perez told Mr. Palencia that she had made a mistake and would return to Guatemala when she obtained passports for herself and the child. Mr. Palencia cooperated with the effort to secure the passports, and for months afterwards Ms. Perez told him that she was merely waiting for the passports to be issued to return to Guatemala. It was not until July of 2017 that Ms. Perez advised Mr. Palencia that she would not be returning H.J.D.V. to Guatemala. *See* D.E. 144 at 12.

Before July of 2017, then, Mr. Palencia did not assert his rights of custody or revoke his consent to H.J.D.V. staying in the United States because he understood that Ms. Perez and H.J.D.V. would be returning to Guatemala as soon as they received their passports. The district court correctly ruled that the wrongful retention took place in July of 2017, when Mr. Palencia's consent for H.J.D.V. to remain in the United States expired. *See Hochhauser*, 876 F.3d at 420–23; *Blackledge*, 866 F.3d at 179; *Darin*, 746 F.3d at 10–11.[5]

---

[5] Because we would affirm the district court's ruling under any standard of review, we need not decide whether a determination about the date of wrongful retention constitutes a finding of fact

18

**IV**

The district court's order granting Mr. Palencia's Hague Convention petition is affirmed.

**AFFIRMED.**

---

subject to clear error review. *See, e.g., Walker v. Walker*, 701 F.3d 1110, 1118 (7th Cir. 2012); *Karkkainen v. Kovalchuck*, 445 F.3d 280, 290 (3d Cir. 2006).