RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0235p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

DOMENICO TAGLIERI,

                *Plaintiff-Appellee*,

    *v.*

MICHELLE MONASKY,

                *Defendant-Appellant*.

> No. 16-4128

---

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:15-cv-00947—Solomon Oliver, Jr., Chief District Judge.

Argued:  June 13, 2018

Decided and Filed:  October 17, 2018

Before:  COLE, Chief Judge; BOGGS, BATCHELDER, MOORE, CLAY, GIBBONS, SUTTON, COOK, McKEAGUE, GRIFFIN, KETHLEDGE, WHITE, STRANCH, DONALD, THAPAR, BUSH, LARSEN, and NALBANDIAN, Circuit Judges.

---

## COUNSEL

**REARGUED EN BANC:**  Aidan Taft Grano, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant.  John D. Sayre, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, for Appellee.  **ON SUPPLEMENTAL BRIEF:**  Aidan Taft Grano, Amir C. Tayrani, Melanie L. Katsur, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., Christopher R. Reynolds, Amy M. Keating, ZASHIN & RICH CO., L.P.A., Cleveland, Ohio, for Appellant.  John D. Sayre, Amy Berman Hamilton, NICOLA, GUDBRANSON & COOPER, LLC, Cleveland, Ohio, for Appellee.  Michael A.F. Johnson, ARNOLD & PORTER KAYE SCHOLER LLP, Washington, D.C., Rachel G. Skaistis, CRAVATH, SWAINE & MOORE LLP, New York, New York, for Amici Curiae.

    SUTTON, J., delivered the opinion of the court in which BOGGS, BATCHELDER, COOK, McKEAGUE, KETHLEDGE, THAPAR, BUSH, LARSEN, and NALBANDIAN, JJ.,

joined. BOGGS, J. (pp. 11–16), delivered a separate concurring opinion in which BATCHELDER, COOK, McKEAGUE, and BUSH, JJ., joined. MOORE, J. (pp. 17–24), delivered a separate dissenting opinion in which COLE, C.J., and CLAY, GIBBONS, GRIFFIN, WHITE, STRANCH, and DONALD, JJ., joined. GIBBONS, J. (pp. 25–27), delivered a separate dissenting opinion in which COLE, C.J., and MOORE, CLAY, GRIFFIN, WHITE, and STRANCH, JJ., joined. STRANCH, J. (pp. 28–29), delivered a separate dissenting opinion in which COLE, C.J., and MOORE, CLAY, GIBBONS, and WHITE, JJ., joined.

---

**OPINION**

---

SUTTON, Circuit Judge. Domenico Taglieri and Michelle Monasky were married. When the union fell apart, Monasky took A.M.T., their two-month-old daughter, from Italy to the United States. Taglieri filed a petition under the Hague Convention to return A.M.T. to Italy. The district court granted the petition after finding that Italy was A.M.T.'s country of habitual residence. Monasky appealed.

Who wins turns on who decides. The Hague Convention places the child's habitual residence front and center in trying to achieve its goal of discouraging spouses from abducting the children of a once-united marriage. The Convention and our cases establish that the inquiry is one of fact. Judge Oliver held a four-day hearing about the point, after which he wrote a 30-page opinion that carefully and thoughtfully explained why Italy was A.M.T.'s habitual residence. No part of that decision goes awry legally, and no part of his habitual-residence finding sinks to clear error. We affirm.

I.

Taglieri, an Italian, and Monasky, an American, met in Illinois. Taglieri, who was already an M.D., was studying for his Ph.D. and worked with Monasky, who already had a Ph.D. They married in Illinois in 2011. Two years later, the couple moved to Italy to pursue their careers, with Taglieri arriving in February and Monasky arriving in July. At first, the couple lived in Milan, where they each found work—Taglieri as an anesthesiologist, Monasky as a research biologist. The marriage had problems, including physical abuse. Taglieri struck Monasky in the face in March 2014. After that, Monasky testified, he continued to slap her,

making her increasingly afraid of him, and "forced himself upon [her] multiple times." R. 88-4 at 201.

Monasky became pregnant with A.M.T. in May 2014, after one of the times Taglieri forced her to have sex, she claims. In June 2014, Taglieri took a job at a hospital in Lugo, about three hours from Milan. Monasky stayed in Milan, where she worked at a different hospital. Monasky had a difficult pregnancy, which, when combined with the long-distance separation, strained the relationship further. To make matters worse, she didn't speak Italian or have a valid driver's license, increasing her dependence on Taglieri for help with basic tasks. Monasky began investigating health care and child care options in the United States and looking for American divorce lawyers. But the couple also looked into child care options in Italy and prepared for A.M.T.'s arrival at the same time.

In February 2015, Monasky emailed Taglieri about seeking a divorce and investigated a move back to the United States. The next day, Monasky and Taglieri went to the hospital in Milan for a pregnancy checkup. The doctors recommended that they induce labor. Monasky refused because she preferred a natural birth, upsetting Taglieri and prompting more verbal sparring. On the ride home from the hospital, Monasky asked Taglieri to turn the car around because she felt contractions. Taglieri refused. Back at their apartment, the arguments continued, with Taglieri calling her "the son of a devil." R. 88-4 at 113.

Later that night, Monasky took a taxi to the hospital. Once Taglieri realized she had left, he went to the hospital and was there, along with Monasky's mother, during the labor and at A.M.T.'s birth by emergency cesarean section. After Monasky and A.M.T. left the hospital, Taglieri returned to Lugo, and Monasky stayed in Milan with A.M.T. and her mother.

In March 2015, after Monasky's mother returned to the United States, Monasky told Taglieri that she wanted to divorce him and move to America. A few days later, however, Monasky left Milan to stay with Taglieri in Lugo. While Taglieri said he thought this would help them "clarify any existing issues," R. 88-1 at 39, Monasky said she went to Lugo because she couldn't recover from her cesarean section and take care of A.M.T. alone. Monasky and Taglieri dispute whether they reconciled in Lugo. Taglieri says they did. Monasky says they

didn't. During this time, the two jointly initiated applications for Italian and American passports for A.M.T.

In late March, Taglieri and Monasky had another argument. As the dispute escalated, Monasky slammed her hand on the table. Taglieri raised his hand as if he were going to hit her. But he didn't. He instead went into the kitchen. Monasky thought she heard Taglieri pick up a knife, but he came back into the room carrying ice cream. Soon after, Taglieri went to work and Monasky took A.M.T. to the police, seeking shelter in a safe house. She told the police that Taglieri was abusive. After Taglieri returned home and found his wife and daughter missing, he went to the police to revoke his permission for A.M.T.'s American passport. Two weeks later, Monasky left Italy for the United States, taking eight-week-old A.M.T. with her.

Taglieri filed an action in Italian court to terminate Monasky's parental rights. The court ruled in Taglieri's favor ex parte. Then Taglieri filed a petition in the Northern District of Ohio seeking A.M.T.'s return under the Hague Convention. The district court granted Taglieri's petition. Monasky appealed. After this court and the United States Supreme Court denied her motion for a stay pending appeal, Monasky returned A.M.T. to Italy.

On appeal, a divided panel of this court affirmed the district court. 876 F.3d 868 (2017). We granted Monasky's petition for rehearing en banc. No. 16-4128 (Mar. 2, 2018).

II.

Ninety-nine countries, including the United States and Italy, have signed the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89. *See* Status Table, HCCH, https://www.hcch.net/en/instruments/ conventions/status-table/?cid=24 (last updated Sept. 12, 2018). The treaty addresses a pressing and never-ceasing policy problem—the abductions of children by one half of an unhappy couple. The Convention's mission is basic: to return children "to the State of their habitual residence," to require any custody disputes to be resolved in that country, and to discourage parents from taking matters into their own hands by abducting a child. Hague Convention pmbl.

Federal law, namely the International Child Abduction Remedies Act, implements the Hague Convention and hews to the treaty's language. 22 U.S.C. § 9001 *et seq.* A parent may petition a federal or state court to return abducted children to their country of habitual residence. *Id.* § 9003(b). The federal or state court determines whether to return the child. *Id.* § 9001(b)(4). Courts in the country of habitual residence then determine the "merits of any underlying child custody claims." *Id.* The parent seeking return of a child must prove by a preponderance of evidence that the child was "wrongfully removed . . . within the meaning of the Convention." *Id.* § 9003(e)(1)(A). The Hague Convention defines wrongful removal as taking a child in violation of custodial rights "under the law of the State in which the child was habitually resident immediately before the removal." Hague Convention art. 3.

The key inquiry in many Hague Convention cases, and the dispositive inquiry here, goes to the country of the child's habitual residence. Habitual residence marks the place where a person customarily lives. *See Webster's New International Dictionary* 1122, 2119 (2d ed. 1942) (defining "residence" as a place where a person "actually lives" and "habitual" as "customary").

Building on our cases in the area, *Ahmed v. Ahmed* offers two ways to identify a child's habitual residence. 867 F.3d 682 (6th Cir. 2017). The primary approach looks to the place in which the child has become "acclimatized." *Id.* at 687. The second approach, a back-up inquiry for children too young or too disabled to become acclimatized, looks to "shared parental intent." *Id.* at 689; *see also Robert v. Tesson*, 507 F.3d 981, 992 n.4 (6th Cir. 2007). Every circuit to consider the question looks to both standards. *Ahmed*, 867 F.3d at 689; *see Mauvais v. Herisse*, 772 F.3d 6, 11 (1st Cir. 2014); *Guzzo v. Cristofano*, 719 F.3d 100, 110 (2d Cir. 2013); *Karkkainen v. Kovalchuk*, 445 F.3d 280, 296 (3d Cir. 2006); *Maxwell v. Maxwell*, 588 F.3d 245, 253 (4th Cir. 2009); *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012); *Redmond v. Redmond*, 724 F.3d 729, 746 (7th Cir. 2013); *Barzilay v. Barzilay*, 600 F.3d 912, 918 (8th Cir. 2010); *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004); *Kanth v. Kanth*, No. 99-4246, 2000 WL 1644099, at *1–2 (10th Cir. Nov. 2, 2000); *Chafin v. Chafin*, 742 F.3d 934, 938–39 (11th Cir. 2013).

As to the first approach, the question is "whether the child has been physically present in the country for an amount of time sufficient for acclimatization and whether the place has a

degree of settled purpose from the child's perspective." *Ahmed*, 867 F.3d at 687 (quotations omitted). District courts ask these sorts of questions in determining a child's acclimatization: whether the child participated in "academic activities," "social engagements," "sports programs and excursions," and whether the child formed "meaningful connections with the [country's] people and places." *Id.* (quotations omitted).

But the acclimatization inquiry, as *Ahmed* appreciated, may prove difficult, sometimes impossible, for young children. An infant "never forms" "or is incapable of" forming the kinds of "ties" to which the acclimatization standard looks. *Id.* at 689. Unwilling to leave infants with no habitual residence and thus no protection from the Hague Convention, *Ahmed* adopted an alternative inquiry for infants incapable of acclimating. In that setting, *Ahmed* tells courts to determine the "shared parental intent of the parties" and to identify the location where the parents "intended the child[] to live." *Id.* at 690. *Ahmed* says that "the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case." *Id.*

Both of these inquiries come back to the same, all-important point—the habitual residence of the child—on which the protections of the Hague Convention pivot.

The Hague Convention's explanatory report treats a child's habitual residence as "a question of pure fact." Elisa Pérez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention*, *in* 3 *Acts and Documents of the Fourteenth Session, Child Abduction* 426, 445 (1982); *see Medellín v. Texas*, 552 U.S. 491, 507 (2008) (looking to "the postratification understanding" of signatory nations in interpreting a treaty (quotation omitted)). Consistent with that understanding, our cases treat the habitual residence of a child as a question of fact. *See, e.g.*, *Ahmed*, 867 F.3d at 686; *Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009); *Tesson*, 507 F.3d at 995.

Measured by these insights and these requirements, the district court's ruling should be affirmed. No one thinks that A.M.T. was in a position to acclimate to any one country during her two months in this world. That means this case looks to the parents' shared intent.

In answering that question, we must let district courts do what district courts do best—make factual findings—and steel ourselves to respect what they find. While we review transcripts for a living, they listen to witnesses for a living. While we largely read briefs for a living, they largely assess the credibility of parties and witnesses for a living. Consistent with the comparative advantages of each role, clear-error review is highly deferential review. In the words of the Supreme Court, we leave fact finding to the district court unless we are "left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). In the words of the Sixth Circuit, we leave this work to the district court unless the fact findings "strike us as wrong with the force of a five-week-old, unrefrigerated dead fish." *United States v. Perry*, 908 F.2d 56, 58 (6th Cir. 1990) (quotation omitted).

Nothing in Judge Oliver's habitual-residence finding leaves a "definite and firm conviction that a mistake" was made or, more pungently, strikes one as wrong with "the force of a five-week-old, unrefrigerated" aquatic animal. He presided over a four-day bench trial and heard live testimony from several witnesses, including most essentially the two parents: Monasky and Taglieri. After listening to the witnesses and weighing their credibility, Judge Oliver issued a 30-page opinion finding that Italy is A.M.T's country of habitual residence. *Taglieri v. Monasky*, No. 1:15 CV 947, 2016 WL 10951269 (N.D. Ohio Sept. 14, 2016).

Judge Oliver's opinion is thorough, carefully reasoned, and unmarked by any undue shading of the testimony provided by the competing witnesses. Some evidence, as he pointed out, supported the finding that Monasky and Taglieri intended to raise A.M.T. in Italy. For example: Monasky and Taglieri agreed to move to Italy to pursue career opportunities and live "as a family" before A.M.T.'s birth. *Id.* at *7. The couple secured full-time jobs in Italy, and Monasky pursued recognition of her academic credentials by Italian officials. *Id.* Together, Monasky and Taglieri purchased several items necessary for raising A.M.T. in Italy, including a rocking chair, stroller, car seat, and bassinet. *Id.* at *8. Monasky applied for an Italian driver's license. *Id.* And Monasky set up routine checkups for A.M.T. in Italy, registered their family to host an *au pair* there, and invited an American family member to visit them there in six months. *Id.*

Some evidence, as the trial court acknowledged, pointed in the other direction. For example: Monasky at times expressed a desire to divorce Taglieri and return to the United States. *Id.* She contacted divorce lawyers and international moving companies. *Id.* at *2, *8–9. And Monasky and Taglieri jointly applied for A.M.T.'s passport, so that she could travel to the United States. *Id.* at *3.

Faced with this two-sided record, Judge Oliver had the authority to rule in either direction. He could have found that Italy was A.M.T.'s habitual residence or he could have found that the United States was her habitual residence. After fairly considering all of the evidence, he found that Italy was A.M.T.'s habitual residence. *Id.* at *10. Call our standard of review what you will—clear-error review, abuse-of-discretion review, five-week-old-fish review—we have no warrant to second-guess Judge Oliver's well-considered finding.

Monasky resists this conclusion on several grounds. She claims that the district court's determination of habitual residence is a finding of "ultimate fact" that we review de novo. Appellant's Supp. Br. 20. Whatever Monasky means by *ultimate* fact, our cases lack such ambiguity: So long as the district court applies the correct legal standard, as Judge Oliver did here, the determination of habitual residence is a question of fact subject to clear-error review, sometimes characterized as abuse-of-discretion review, as the Convention's explanatory report says and as our cases confirm. *See Ahmed*, 867 F.3d at 686; *see also Pullman-Standard v. Swint*, 456 U.S. 273, 287 (1982) ("Rule 52(a) broadly requires that findings of fact not be set aside unless clearly erroneous. . . . It does not divide facts into categories; in particular, it does not divide findings of fact into those that deal with 'ultimate' and those that deal with 'subsidiary' facts."). No such error occurred here.

Nor does it make a difference that the district court's decision predated *Ahmed*. Because *Ahmed* followed existing circuit law, *see Tesson*, 507 F.3d 981; *Friedrich v. Friedrich*, 983 F.2d 1396 (6th Cir. 1993), Judge Oliver had no problem framing the habitual-residence inquiry. He found no acclimatization for this infant or any other because they "lack cognizance of their surroundings sufficient to become acclimatized to a particular country or to develop a sense of settled purpose." *Taglieri*, 2016 WL 10951269, at *6 (quoting *Tesson*, 507 F.3d at 992 n.4). Monasky embraces that standard and that finding, as do we.

Judge Oliver then "[a]ssume[d] that the Sixth Circuit would hold that the shared intent of the parties is relevant in determining the habitual residence of an infant child," *Taglieri*, 2016 WL 10951269, at *10, as every other circuit to consider the question has done.  He found that, considering the record as a whole, Monasky and Taglieri intended to raise A.M.T. in Italy.  *Id.* That legal inquiry respects *Ahmed*, which applied the same standard.  Monasky agrees with that standard; she just disagrees with the trial judge's finding under it.

Any further concerns about the point can be resolved by recalling this reality.  *Ahmed* itself *affirmed* the district court in that case.  It saw no need to ask the district court to make any more findings or do anything more than it already had done.  What was good for that case is good for this one.

Monasky argues that she and Taglieri never had a "meeting of the minds" about their child's future home.  Appellant's Br. 34.  But that possibility offers a sufficient, not a necessary, basis for locating an infant's habitual residence.  An absence of a subjective agreement between the parents does not by itself end the inquiry.  Otherwise, it would place undue weight on one side of the scale.  Ask the products of any broken marriage, and they are apt to tell you that their parents did not see eye to eye on much of anything by the end.  If adopted, Monasky's approach would create a presumption of no habitual residence for infants, leaving the population most vulnerable to abduction the least protected.

Monasky claims that Judge Oliver placed too much weight on the fact that Monasky and Taglieri established a matrimonial home in Italy and the fact that Monasky lacked definite plans to leave Italy.  *Taglieri*, 2016 WL 10951269, at *7–8.  But if clear-error review entitles an appellate court to rebalance the *relative weights* assigned to these sorts of details, that would indeed create a de novo standard of review, which is just what our cases prohibit.  The question remains one of habitual residence.  All agree that both facts—the location of the matrimonial home and any plans to leave it—bear on the riddle and thus were relevant considerations. Nothing in Judge Oliver's opinion suggests that he considered either one of them dispositive. That an "infant will normally be a habitual resident of the country where the matrimonial home exists" is a fact of life that we cannot change.  *Id.* at *7.

That does not mean that an infant's place of birth *always* will be the habitual residence if she remains there up to the abduction. That approach would create problems of its own. Imagine an American couple who gives birth to an infant during a brief stay in Italy, perhaps during a vacation or month-long residency, after which one of them takes the child before the vacation (and marriage) ends. In those instances, it would be difficult to maintain that the child habitually resides in Italy.

That leaves one last argument for reversing Judge Oliver's decision: a preference for creating a presumption *against* finding a habitual residence for infants. But that is the worst of all possible worlds because it turns the Convention upside down. It would deprive the children most in need of protection—infants—of any shelter at all and encourage self-help options along the way, creating the risk of "abduction ping pong" at best, *Ovalle v. Perez,* 681 F. App'x 777, 784 (11th Cir. 2017), or making possession 100% of the law at worst.

Sometimes the only way to resolve a complicated problem is to recognize that there is no single solution. As often happens with child-abduction disputes, the issues are fraught, the fact patterns unfortunate. Escalating acrimony between parents often severs a relationship beyond repair. And that usually results in conflicting testimony as to how things fell apart. But we will not make this case easier, and we are sure to make the next case harder, by assuming the role of principal decision maker. As with other fact-bound inquiries, so with this one. We must trust those with a ring-side seat at the trial to decide whose testimony is most credible and what evidence is most relevant. And to do that, we must treat the habitual-residence inquiry as we always have: a question of fact subject to deferential appellate review.

Because the district court applied the correct legal standard and made no clear errors in its habitual-residence finding, and indeed quite carefully considered all of the competing evidence in its 30-page opinion, we affirm.

_____

## CONCURRENCE

_____

BOGGS, Circuit Judge, concurring. I join the majority opinion and concur in its conclusion that the habitual residency inquiry is a question of fact and that the district court made no clear error in its factual findings in this case. I take issue, however, with the characterization that all Hague Convention cases are to be governed by a strict two-part test attributed to our recent case, *Ahmed*.

For cases such as this one, there exists a simple standard consistent with precedent: absent unusual circumstances, where a child has resided exclusively in a single country, especially with both parents, that country is the child's habitual residence. An excessive reliance solely on the two-part test, one that will often turn exclusively on "shared parental intent," could jeopardize that simple conclusion for young children, leaving them without a habitual residence and therefore unprotected by the Hague Convention. In such circumstances, either parent will be free to grab the child and go, leaving no law, only self-help, as the remedy for the abduction. This is contrary not just to case law and the purposes of the Convention, but also common sense.

When a child has a habitual residence, the Hague Convention generally requires that a determination of custody rights must be made in that country. Convention on the Civil Aspects of International Child Abduction, arts. 3, 12, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49 (reprinted at 51 Fed. Reg. 10494 (Mar. 26, 1986)); *Chafin v. Chafin*, 568 U.S. 165, 180 (2013). On the other hand, when a child has *no* habitual residence, either parent is free, so far as the Convention is concerned, to take the child to, or to retain the child in, *any* country, without fear of legal process. *See Friedrich v. Friedrich*, 983 F.2d 1396, 1400 (6th Cir. 1993) (*"Friedrich I"*). Determination of habitual residence, then, is often the be-all and end-all in Hague Convention cases. *Mozes v. Mozes*, 239 F.3d 1067, 1072 (9th Cir. 2001) ("'Habitual residence' is the central—often outcome-determinative—concept on which the entire system is founded.").

Relying solely on the child's "acclimatization" and "shared parental intent" to determine habitual residence can too often mean that a young child has no habitual residence and therefore that the Hague Convention will not be able to protect against the child's abduction or provide a mechanism for the child's return. Infants and newborns almost surely "lack the cognizance to acclimate" to their country of birth. *See Ahmed v. Ahmed*, 867 F.3d 682, 690 (6th Cir. 2017). And arguably a child of even a year or two may be too young to acclimate to a country that it cannot, or can only barely, recognize.[1] *See Ahmed*, 867 F.3d at 690 (affirming district court's determination that nine-month-old twins were incapable of acclimating "anywhere").

Unable to show that a young child had acclimated to its country of birth in the short time it lived there before being abducted, it often will be the case that a party who petitions for the child's return under the Hague Convention likewise will be unable to establish a shared parental intent for the child to reside in that country. After all, in most circumstances where the inter-family tension is so great that one parent has abducted a young child, it is very likely that the parents will have quarreled about many things, most especially about their hopes and plans for where the child will be raised.

There is a better way to handle cases like this. Where, as here, a child has lived in only one country with his or her parents, and the child's parents do not intend their stay there to be temporary, then that country is the child's habitual residence, absent unusual circumstances. *See Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004). Such circumstances might be present, for instance, in cases of "birth tourism," where, for medical, legal, or financial reasons, a child is born in a country where at least one of the parents has few ties and no intent to remain after the birth. *See Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003).

But such unusual cases should only set the limits of the general rule. They should not preclude the common-sense conclusion that a young child who has resided exclusively in an established, albeit inharmonious, living arrangement with his or her parents in a single country has a habitual residence in that country. There is no reason to permit the exceptional to outweigh

---

[1]Since the two-part test also applies to developmentally disabled children, it is worth noting that such children, depending on the extent of their disability and the degree of rancor in their home, may *never* acquire a habitual residence at all. That cannot be what the framers of the Hague Convention had in mind.

the ordinary, but in many cases adhering to the two-part test at the exclusion of all else will not just allow, but dictate, that result. While I agree that the habitual-residence inquiry is and should remain fact-intensive, most cases in which a child has lived in just one country should result in the conclusion that that country is the child's habitual residence, a determination that will bring the child within the protections of the Hague Convention.

Indeed, this court's precedent has always been in keeping with the common-sense view that children who have known but one country generally are habitual residents of that country. We suggested as much in *Friedrich I*, where we held that a child who "was born in Germany and resided exclusively in Germany until his mother removed him to the United States [when he was nineteen months old] . . . was a habitual resident of Germany at the time of his removal." 983 F.2d at 1402; *see also id.* at 1401 ("[T]here is no real distinction between ordinary residence and habitual residence.") (citing *Re Bates*, No. CA 122.89, High Court of Justice, United Kingdom (1989)). Likewise, in *Simcox v. Simcox*, 511 F.3d 594 (6th Cir. 2007), we concluded that a child who "was born in Mexico and resided there her entire life (other than for some temporary sojourns abroad)" was a habitual resident of Mexico. *Id.* at 602.

Although we described *Friedrich I* as a "simple case," 983 F.2d at 1402, such an obvious result likely would no longer be permissible under a framework that solely looks to shared parental intent in cases in which a child is too young to acclimate. *See Robert v. Tesson*, 507 F.3d 981, 991 (6th Cir. 2007) (observing that focusing on shared parental intent makes easy cases hard and leads to questionable results in determining habitual residence). The nineteen-month-old child at the center of *Friedrich I* may have been too young to acclimate to Germany, and there was considerable evidence of marital discord and a lack of shared parental intent, with the child's American servicewoman mother claiming that she always had intended to return to the United States with her son when her tour of duty was complete. *Friedrich I*, 983 F.2d at 1401. Consequently, applying this two-part formulation to the habitual-residence determination in *Friedrich I* might very well have resulted in denying relief under the Hague Convention in what was otherwise a "simple case" that yielded the opposite outcome.

The two-part analytical framework at issue is said to stem from *Ahmed*, which built off our prior case, *Robert*, but neither holding adopted the acclimatization test for *all* habitual-

residence cases.  *Robert* embraced the acclimatization test to address the set of facts faced there—children moving back and forth between two countries.  We explained in *Robert* that *Friedrich I* had nothing to say about the standard to apply "when a child has alternated residences between two or more nations."  507 F.3d at 992.  But we then noted, "[f]ortunately, several other Circuits have considered *this issue.*"  *Ibid.* (emphasis added).  Examining other circuits' use of an "acclimatization test" for *that issue*—i.e., the habitual residence of a child who has lived in more than one country—we "h[e]ld that a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a degree of settled purpose from the child's perspective."  *Id.* at 993 (quotation marks and citation omitted).  Although we observed that this holding was consistent with *Friedrich I*, nowhere did we suggest that it *supplanted Friedrich I*'s holding.  *Ibid.*  Accordingly, *Robert* adopted the acclimatization test to use when, and only when, the child has lived in multiple countries, leaving *Friedrich I* intact as our precedent for one-country cases.

Although it is true that *Ahmed* supplemented the acclimatization test by adopting a shared-parental-intent exception to it for very young children, it is incorrect to say that the *Ahmed* framework is generally applicable to all Hague Convention cases.  Such a broad construction of *Ahmed* is not warranted.  *Ahmed*, like *Robert* and unlike *Friedrich I,* involved children who had resided in two different countries—in the Ahmeds' case, the United States and the United Kingdom.  In determining whether the U.K. was the children's habitual residence, the *Ahmed* court, following *Robert*, looked first to whether the children had become acclimatized there.  Finding the acclimatization test impracticable in those circumstances, given the children's young age, the court then considered whether their parents shared an intent to raise them in the United Kingdom.  867 F.3d at 690.

The holdings—and therefore the authoritative teaching—of *Robert* and *Ahmed*, being no more extensive than the facts that undergird them, provide meaningful guidance only in multiple-country cases.**2**  They do not disturb the preexisting common-sense simplicity of single-country

---

**2**We should be mindful of "Chief Justice Marshall's sage observation that 'general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used.  If they go beyond the case,

cases, such as *Friedrich I* and *Simcox*, where the child's only country of residence unremarkably was held to be the child's habitual residence.**3**

This uncomplicated approach also has been employed in rulings by our sister circuits. The Ninth Circuit is one of the few courts to explicitly consider what it takes for very young children to acquire an initial habitual residence. In *Holder*, the court first observed that a child does not automatically become a habitual resident of the place in which the child is born. 392 F.3d at 1020. True enough. "Nonetheless," the court continued, "if a child is born where the parents have their habitual residence, the child normally should be regarded as a habitual resident of that country." *Ibid.* Those circumstances "clearly appl[ied]" to the Holders' youngest son: "He was born in California while both of his parents were habitual residents of the United States." *Ibid.* (holding that child was habitual resident of United States when family moved to Germany when he was two months old); *see also Nicolson v. Pappalardo*, 605 F.3d 100, 104–05 (1st Cir. 2010) (concluding that parties' three-month-old daughter, who had lived exclusively in Australia with her married parents, had acquired an *initial* habitual residence in that country by the time her American mother took her to Maine, despite the mother's claims that she never shared an intent to raise the child in Australia due to disintegration of marriage). Consistent with *Holder* and *Nicolson*, courts often have concluded, implicitly or with little analysis, that a young child is habitually resident in the country of its birth when it lived there in an established home with its parents. *See, e.g.*, *Larbie v. Larbie*, 690 F.3d 295, 298, 311 (5th

---

they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision.'" *Ark. Game & Fish Comm'n v. United States*, 568 U.S. 23, 35 (2012) (quoting *Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821)). *See also United States v. Lucido*, 612 F.3d 871, 876 (6th Cir. 2010) (observing that cases implicating issues neither brought to the attention of the court nor ruled upon do not establish binding precedent on the unexamined point).

**3**Our analysis in *Ahmed* further supports restricting the acclimatization test, and its shared-parental-intent exception, to cases involving multiple countries. As authority for adopting the shared-parental-intent test in *Ahmed*, we turned to other circuits' cases. Every one of those cases involved children living in multiple countries. *See Mauvais v. Herisse*, 772 F.3d 6 (1st Cir. 2014) (United States, Haiti, France, and Canada); *Guzzo v. Cristofano*, 719 F.3d 100 (2d Cir. 2013) (United States and Italy); *Karkkainen v. Kovalchuk*, 445 F.3d 280 (3d Cir. 2006) (United States, Finland, and Russia); *Maxwell v. Maxwell*, 588 F.3d 245 (4th Cir. 2009) (United States and Australia); *Larbie v. Larbie*, 690 F.3d 295 (5th Cir. 2012) (United States and United Kingdom); *Redmond v. Redmond*, 724 F.3d 729 (7th Cir. 2013) (United States and Ireland); *Barzilay v. Barzilay*, 600 F.3d 912 (8th Cir. 2010) (United States, Netherlands, and Israel); *Holder*, 392 F.3d 1009 (9th Cir. 2004) (United States, Germany, and Japan); *Kanth v. Kanth*, No. 99-4246, 2000 WL 1644099 (10th Cir. Nov. 2, 2000) (United States, Denmark, and Australia); *Chafin v. Chafin*, 742 F.3d 934 (11th Cir. 2013) (per curiam) (United States and Scotland).

Cir. 2012) (holding that, for a twenty-three-month-old child who had lived exclusively in Texas prior to his mother taking him to the United Kingdom, where she was a permanent resident, the United States "was indisputably his habitual residence before his arrival in the U.K."); *Tsarbopoulos v. Tsarbopoulos*, 176 F. Supp. 2d 1045, 1057 (E.D. Wash. 2001) (concluding that two-month-old child's habitual residence was the United States prior to the family's move to Greece).

The strict two-part "*Ahmed* test" all too often will compel the conclusion that a very young child is without a habitual residence. It therefore conflicts with the very purposes of the Hague Convention by leaving many young children unprotected. We have observed that the Convention is "generally intended to restore the pre-abduction status quo and to deter parents from crossing borders in search of a more sympathetic court." *Friedrich v. Friedrich*, 78 F.3d 1060, 1064 (6th Cir. 1996) (*"Friedrich II"*). Under the two-part test, parents who are at odds with one another will be able to "freely engage in a continuous game of abduction ping pong, given the many months or even years in which they could freely abduct the child before any particular location became the child's habitual residence."[4] *Ovalle v. Perez*, 681 F. App'x 777, 784 (11th Cir. 2017) (per curiam). Such a result is inconsistent with the Hague Convention's laudable goals.

Thus, I concur in Judge Sutton's opinion on its own terms and agree with his reasoning as to one way of upholding Judge Oliver's decisions. I agree that the district court's factual determinations were not clearly erroneous and that *Ahmed*'s two-part test is one way of assessing habitual residence, particularly in multiple country cases. However, I also would hold that the decision below is correct for the reasons set out above.

---

[4]It bears emphasizing that a finding of no habitual residence means that *either* parent, regardless of gender, is free to abduct the child and that in such a case *neither* parent will be entitled to relief under the Hague Convention. In other words, had the circumstances been reversed in this case—an American mother who gave birth in the United States and an Italian father who was as disconnected to this country as Monasky was to Italy—the father would have been perfectly entitled to take the child back to Italy (or any other country), and the Hague Convention would have nothing to say about it.

———————————

**DISSENT**

———————————

KAREN NELSON MOORE, Circuit Judge, dissenting. The admirable goal of the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89, ("Hague Convention"), is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence . . . ." Hague Convention, pmbl. "Additionally, according to the official commentary on the Hague Convention, the Convention should be read to prevent a circumstance where 'the child is taken out of the family and social environment in which its life has developed.'" *Robert v. Tesson*, 507 F.3d 981, 988 (6th Cir. 2007) (quoting Elisa Pérez-Vera, *Explanatory Report on the 1980 Hague Child Abduction Convention* ¶ 12, *in* 3 Acts and documents of the Fourteenth Session, Child Abduction (1982) [hereinafter Pérez-Vera Report], https://assets.hcch.net/upload/expl28.pdf). To that end, the Hague Convention requires the return of a child who is wrongfully removed or retained to her country of habitual residence.

In this case, plaintiff-appellee Domenico Taglieri must prove by a preponderance of the evidence that his daughter, A.M.T., was wrongfully removed from Italy by her mother, defendant-appellant Michelle Monasky, when A.M.T. was eight weeks old. The key question in this case is: Where was A.M.T. habitually resident prior to her removal from Italy? If her habitual residence was Italy, then her removal was wrongful; conversely, if A.M.T.'s habitual residence was not Italy, then her removal was not wrongful. The district court, analyzing the issue without the benefit of our decision in *Ahmed v. Ahmed*, 867 F.3d 682 (6th Cir. 2017), concluded that Taglieri had proved by a preponderance of the evidence that A.M.T. was habitually resident in Italy.

I agree with the lead opinion that *Ahmed* provides the correct legal standard for determining a child's habitual residence. But I believe that it is the district court's role to decide this case in the first instance, with the benefit of our clarification of the law, and in accordance with the proper standard of review. Thus, I respectfully dissent from the decision to affirm on

the basis of the cold record, and believe that we should remand to the district court, who had the benefit of presiding over the hearing in this case, to make the relevant determinations.

## I.

"The Convention does not define 'habitual residence.'" *Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1400 (6th Cir. 1993). Instead, as the lead opinion explains, we have developed a two-step analytical framework to determine a child's habitual residence.

Our "primary approach" is the acclimatization standard. *Ahmed*, 867 F.3d at 688–89. Under this standard, "a child's habitual residence is the nation where, at the time of their removal, the child has been present long enough to allow acclimatization, and where this presence has a 'degree of settled purpose from the child's perspective.'" *Robert v. Tesson*, 507 F.3d 981, 993 (6th Cir. 2007) (quoting *Feder v. Evans-Feder*, 63 F.3d 217, 224 (3d Cir. 1995)). Factors that are relevant to our inquiry of whether a child is acclimatized to a particular country include: (1) the child's attendance at school or pre-school, *see id.* at 996; (2) "the child's activities . . . including social engagement and extracurricular programming," *Neumann v. Neumann*, 684 F. App'x 471, 479 (6th Cir. 2017); *see Redmond v. Redmond*, 724 F.3d 729, 743 (7th Cir. 2013); (3) the child's significant personal connections with people in the country, *see Robert*, 507 F.3d at 996; (4) the child's fluency in the language of that country, *see Jenkins v. Jenkins*, 569 F.3d 549, 556 (6th Cir. 2009); (5) the location of the child's belongings, *see id.* at 557; and (6) the child's expressed desire to live in a particular place, *see Robert*, 507 F.3d at 996. Not all of these factors may be relevant in every case, and there may be other pertinent information that is also suggestive of a child's acclimatization. Furthermore, some factors may be more indicative of acclimatization than others, such as where a child attends school. *Robert*, 507 F.3d at 996.

When conducting this fact-intensive analysis, we are guided by a set of overarching principles. *Id.* at 989. First, habitual residence is not an inquiry governed by technical rules, but rather "[t]he facts and circumstances of each case should . . . be assessed without resort to presumptions or pre-suppositions." *Friedrich I*, 983 F.2d at 1401 (quoting *In re Bates*, No. CA 122/89, High Court of Justice, Family Div'n Ct., Royal Court of Justice, United Kingdom

(1989), 1989 WL 1683783). Second, because the issue of wrongful removal or retention revolves around the child's habitual residence, "the court must focus on the child, not the parents." *Id.* Third, our inquiry must focus on the child's "past experience, not future intentions." *Id.* Fourth, only one nation can be a child's habitual residence. *Id.* Fifth, the nationality of a child's parents or which parent is the primary caregiver does not affect a child's habitual residence. *Id.* at 1401–02. Finally, the contested action—whether it be the removal or retention of the child—cannot alone alter a child's habitual residence; instead only "a change in geography and the passage of time" can do so. *Id.* at 1402.

But when a child is so young, or developmentally disabled, as to "lack the cognizance to acclimate to any residence," the acclimatization standard is unworkable. *Ahmed*, 867 F.3d at 690. If that is the case, then we instead use the shared parental intent standard. Lead Op. at 5; *Ahmed*, 867 F.3d at 690. The question of when a child is developmentally unable to acclimatize "is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case." *Ahmed*, 867 F.3d at 690. In *Ahmed*, for example, we affirmed the district court's conclusion that twins who were around nine months old were not old enough to acclimatize to their surroundings. *Id.*

Once a district court has determined that the acclimatization standard is unworkable in a particular case, it must determine whether the parties shared an intent about where to raise the child by looking for external indicia of parties' intent. In order to determine whether the parties shared an intent about where to raise the child, we must look for external indicia of the last shared agreement of the parties. *See Mauvais v. Herisse*, 772 F.3d 6, 12 (1st Cir. 2014) ("We look specifically to the latest moment of the parents' shared intent, as the wishes of one parent alone are not sufficient to change a child's habitual residence." (internal quotation marks omitted)); *cf. Berezowsky v. Ojeda*, 765 F.3d 456, 468 (5th Cir. 2014) ("A shared parental intent requires that the parents actually *share* or jointly develop the intention. In other words, the parents must reach some sort of meeting of the minds regarding their child's habitual residence, so that they are making the decision together."). Self-serving testimony by either party about

their internal thought process is insufficient on its own to establish either a shared parental intent or a lack thereof.

For example, in *Ahmed* we affirmed the district court's factual finding about the couple's lack of shared parental intent, which was based on: (1) testimony regarding the parties' acrimonious marital relationship; (2) Mrs. Ahmed's contemporaneous comments to a friend that she planned to return to America and not permanently reside in the United Kingdom; and (3) Mrs. Ahmed's decision to make medical appointments for her children in the United States and maintain her professional license and numerous insurance policies in this country. 867 F.3d at 690–91. Importantly, even though Mr. Ahmed demonstrated that the couple had a "settled mutual intent to live in the United Kingdom in the fall of 2013, before the twins were conceived," we affirmed the district court's finding that the parties lacked a mutual intent to raise their infants in the United Kingdom "from the time the children were conceived until Mrs. Ahmed retained them." *Id.* at 690–91.

Other factors federal courts have considered in this analysis include: (1) a separation agreement signed by both parents stating that the child would reside in a particular country, *Guzzo v. Cristofano*, 719 F.3d 100, 110 (2d Cir. 2013); (2) the parents' and child's visa status in the country that the petitioner claims is the child's habitual residence, *id.* at 111; *Kijowska v. Haines*, 463 F.3d 583, 588 (7th Cir. 2006); (3) a disavowal by one parent to seek custody of the child, *Kijowska*, 463 F.3d at 588; (4) the parents' living situation, including whether they lived together, they owned or rented a home, the length of the lease, the retention of other residences, etc., *Mauvais*, 772 F.3d at 13; *Maxwell v. Maxwell*, 588 F.3d 245, 252 (4th Cir. 2009); (5) the parents' employment, *Maxwell*, 588 F.3d at 252; and (6) the depth of any ties maintained by the parties to other countries, *id.*

This is necessarily a fact-intensive inquiry. Pérez-Vera Report ¶ 15; *cf. Friedrich I*, 983 F.2d at 1401. Thus, for example, the purchase of a bassinet or a car seat for a newborn does not definitely indicate the parents' shared intent to raise the child in a particular country; the parents may merely wish to bring the child home from the hospital safely and not have him sleep on the floor. In contrast, if the parents' purchase of the bassinet and car seat is in conjunction with their decoration and outfitting of an entire nursery with other supplies that are not essential

to an infant's immediate needs, this objective evidence points towards a shared parental intent to raise the child in that place.

It is possible that, after the district court analyzes the facts under the shared parental intent standard, the court will conclude that it is unclear whether the parents shared an intent. Because the petitioner in a Hague Convention case must establish by a preponderance of the evidence that a child has been wrongfully removed or retained from her habitual residence, 22 U.S.C. § 9003(e)(1)(A), if the petitioner cannot demonstrate where the child's habitual residence is located she has not satisfied her burden. *Ahmed*, 867 F.3d at 691.

In rare situations, an infant may not have a habitual residence. *Delvoye v. Lee*, 329 F.3d 330, 333 (3d Cir. 2003) ("[W]here the [marital] conflict is contemporaneous with the birth of the child, no habitual residence may ever come into existence."); *In re A.L.C.*, 607 F. App'x 658, 662 (9th Cir. 2015) ("When a child is born under a cloud of disagreement between parents over the child's habitual residence, and a child remains of a tender age in which contacts outside the immediate home cannot practically develop into deep-rooted ties, a child remains without a habitual residence because if an attachment to a State does not exist, it should hardly be invented." (internal quotation marks and citation omitted)). When a child does not have a habitual residence, the Hague Convention is inapplicable.

This does not create a legal presumption against finding a habitual residence for infants. In most cases, sufficient objective external indicia will exist to guide the district court's analysis of the shared parental intent. For example, every party will have an immigration status in the country of purported habitual residence, whether it be citizenship, permanent residency, a work visa, a tourist visa, or a lack of any legal status. Furthermore, every party will have some kind of living situation. The point is that if, after analyzing a child's habitual residence under our two-step framework, the district court cannot determine where a child is habitually resident, it should not invent a habitual residence because of the faulty assumption that every child must have such a residence.

**II.**

"We review the district court's findings of fact for clear error and review its conclusions about American, foreign, and international law *de novo*." *Friedrich v. Friedrich* (*Friedrich II*), 78 F.3d 1060, 1064 (6th Cir. 1996). The district court's ultimate determination of habitual residence—in other words, its application of the legal standard to its findings of fact—is reviewed de novo. *See Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc) ("Lower court findings of ultimate facts based upon the application of legal principles to subsidiary facts are subject to *de novo* review."). The lead opinion muddies these long-established waters, and states that this is entirely a question of fact. Lead Op. at 6–8. This is an unacknowledged re-writing of our precedent. *See, e.g.*, *Ahmed*, 867 F.3d at 686; *Simcox v. Simcox*, 511 F.3d 594, 601 (6th Cir. 2007); *Robert*, 507 F.3d at 995. And it also puts us at odds with the standard of review used by our sister circuits in these cases. *See Darin v. Olivero-Huffman*, 746 F.3d 1, 9 (1st Cir. 2014); *Larbie v. Larbie*, 690 F.3d 295, 306 (5th Cir. 2012); *Maxwell*, 588 F.3d at 250; *de Silva v. Pitts*, 481 F.3d 1279, 1281 (10th Cir. 2007); *Koch v. Koch*, 450 F.3d 703, 710 (7th Cir. 2006); *Ruiz v. Tenorio*, 392 F.3d 1247, 1252 (11th Cir. 2004); *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004); *Gitter v. Gitter*, 396 F.3d 124, 129, 132–133, 133 n.8 (2d Cir. 2005); *Feder*, 63 F.3d at 222 n.9; *but see Silverman v. Silverman*, 338 F.3d 886, 897 (8th Cir. 2003) (en banc) (holding that "habitual residence [is] a legal determination subject to de novo review" and not applying clear-error review to the district court's findings of fact).

**III.**

In this case, the district court attempted to analyze the parties' shared parental intent in its determination of A.M.T.'s habitual residence. R. 70 (Dist. Ct. Op. at 21) (Page ID #1885). But because the district court issued its decision prior to our adoption of the shared parental intent standard in *Ahmed*, the district court was forced to hypothesize about the contours of this standard. Consequently, in its analysis the district court focused on two circumstantial facts, almost to the total exclusion of other direct evidence.

First, the district court emphasized that Monasky lacked definitive plans to leave Italy when A.M.T. was born; in other words, she did not yet have a plane ticket to the United States.

*Id.* at 22 (Page ID #1886).  But even assuming, counterfactually, that Monasky and Taglieri were in perfect accord that Monasky would travel to the United States with A.M.T. shortly after the child's birth, Monasky needed to wait until A.M.T.'s passport was issued.  Therefore, the lack of a specific departure date is relevant, but not dispositive.  There is reason to be cautious in overly emphasizing this factor:  In some situations, there may be logistical obstacles preventing a child from traveling across international borders that mean that the child's continued presence in a country is not suggestive of the parents' shared parental intent.  *See, e.g.*, *Maxwell*, 588 F.3d at 248–49, 253 (holding that the mother and children's continued residence in Australia did not indicate that the mother agreed with the father that their children should be raised in that country, as the father had hidden the children's passports and refused to provide consent when the mother tried to apply for new travel documents).  Conversely, a parent's travel plans may be a poor proxy for the parents' agreement to raise their child in a particular locale.  The fact that one parent plans to leave the country with the child—and may even have bought plane tickets to do so—cannot alone demonstrate that the parents' shared parental intent was to raise the child in that destination country or that the parents lacked the intent to raise the child in the originating country.[1]

Second, the district court's conclusion that the parties had established a marital home in Italy at some point in time appears to have been the predominant factor in its analysis.  R. 70 (Dist. Ct. Op. at 20–21) (Page ID #1885–86).  The district court's almost total reliance on a marital home that existed for less than a year in its evaluation of the parties' shared parental intent is somewhat confusing, especially considering that the parties resided approximately three hours apart from shortly after Monasky conceived A.M.T. until her final trip to Lugo in March 2015.  R. 47 (Jt. Stip. at ¶¶ 10–11, 26) (Page ID #1018, 1020).  More importantly, although any existence of a marital home is relevant evidence of parties' shared parental intent, it cannot be dispositive.  The key inquiry under the shared parental intent standard is where the parents

---

[1]To hold otherwise would allow one party's change of mind to manipulate a child's habitual residence. Imagine a case in which there are external indicia that the parents intend to raise their newborn in Country A.  The evidence indicates that the parents shared this intent until their infant was six months old.  Then the mother decides unilaterally that she wants to raise the child elsewhere and removes the child to Country B.  The court must look to the parties' shared intent prior to the mother's unilateral change of heart otherwise the removing or retaining parent's wishes would be sufficient to change a child's habitual residence.

"intended the children to live." *Ahmed*, 867 F.3d at 690; *cf. Holder*, 392 F.3d at 1016–17 ("In analyzing [the parents'] intent, we do not lose sight of the fundamental inquiry: the *children's* habitual residence. Parental intent acts as a surrogate for that of children who have not yet reached a stage in their development where they are deemed capable of making autonomous decisions as to their residence." (footnote omitted)). Certainly, if the parents resided together in a particular locale prior to and after the birth of an infant this is evidence that they shared an intent to raise their child in that place. But the existence of a marital home is still only proxy evidence, and thus cannot be the overriding factor. *See Ahmed*, 867 F.3d at 690–91 (holding that, even though the parties "had a settled mutual intent to live" together in the United Kingdom before their twins were conceived, there was no shared parental intent to raise the children in that country).

The lead opinion argues that, as an appellate court, we should not "rebalance the relative weights" of the various facts, as considered by the district court. Lead Op. at 9 (emphasis omitted). But here the district court was speculating about the contours of the shared parental intent standard because we had not yet adopted that test. Indeed, our prior case law left open the question of whether the acclimatization standard was the appropriate test to determine a very young or developmentally disabled child's habitual residence. *Robert*, 507 F.3d at 992 n.4; *Simcox*, 511 F.3d at 602 n.2. As the appellate court, we should not presume that the district court would make the same decision with the benefit of our decision in *Ahmed*. Instead, we should give proper deference to the district court and remand so that the district court can evaluate A.M.T.'s habitual residence in light of *Ahmed* and our decision today. *See Siding & Insulation Co. v. Alco Vending, Inc.*, 822 F.3d 886, 901 (6th Cir. 2016) ("[A] remand is required for the district court to apply the correct legal standard.").

**IV.**

Like many Hague Convention cases, this is a deeply troubling and hard case. As it turns on conducting a fact-intensive inquiry, as guided by our decision in *Ahmed*, I believe that we should remand to the district court so that it can decide the facts within the proper legal framework. Thus, although I agree with the lead opinion about the applicable legal standard, I respectfully dissent from its conclusion to affirm.

————————————

**DISSENT**

————————————

JULIA SMITH GIBBONS, Circuit Judge. I concur in Judge Moore's and Judge Stranch's opinions in full. I therefore agree with the majority that *Ahmed* provides the correct legal standard for determining a child's habitual residence but believe that the case should be remanded so that the district court can make that determination in this instance. I offer the following separate dissenting remarks.

If there is one point on which we all seem to agree, it is that child-abduction cases are difficult and contentious. Such cases are highly fact-intensive yet often involve tangled and conflicting accounts from the opposing sides. That is why these cases are best resolved by the district judges, who engage directly with the testimony and other evidence.

I write separately to address the issue raised by the majority: whether Judge Oliver's opinion contains reversible error. Because I believe that the district court is the better forum in deciding the weight of the evidence under our newly-adopted standard, I dissent from the majority and argue that we should remand the case and allow the district court to evaluate A.M.T.'s habitual residence.

Although a district court's habitual residence determination is based on factual findings that we review for clear error and the determination itself is reviewed for abuse of discretion, "[t]he question of *which standard* should be applied in determining a child's habitual residence under the Hague Convention is one of law, and is reviewed de novo by this Court." *Ahmed v. Ahmed*, 867 F.3d 682, 686 (6th Cir. 2017) (emphasis added); *see also Weaver v. Shadoan*, 340 F.3d 398, 405 (6th Cir. 2003) ("Mixed questions of law and fact are reviewed *de novo*. A district court's findings of ultimate facts, based upon the application of legal principles to subsidiary facts, are also subject to *de novo* review.") (citing *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999) (en banc)).

To be sure, there was no clear error in Judge Oliver's factual determinations. Nothing in his opinion leaves a "definite and firm conviction that a mistake has been committed," *United*

*States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948), or "strikes one as wrong with 'the force of a five-week-old, unrefrigerated' aquatic animal" as the majority points out. *Supra* at 7. It thoroughly engages with the facts and even correctly "[a]ssum[es]" that the shared intent of the parents is "relevant" to the resolution of this case. *Taglieri v. Monasky*, No. 1:15 CV 947, 2016 WL 10951269, at *10 (N.D. Ohio Sept. 14, 2016).

But it is difficult to apply a legal standard that you do not know. At the time of his decision, Judge Oliver did not have the benefit of our opinion in *Ahmed* articulating the proper shared parental intent standard. While the holding in *Ahmed* follows from existing precedent, it also, at a minimum, defines the shared parental intent standard in a way not previously provided by our court. Judge Oliver therefore had no choice but to try and predict the standard's precise dimensions. As a result, rather than focusing on where the parents "intended the child[] to live," *Ahmed*, 867 F.3d at 690, Judge Oliver incorrectly centered his inquiry on whether the parties had established a "marital home" in Italy and on Monasky's failure to immediately leave that marital home for the United States after the child's birth, *Taglieri*, 2016 WL 10951269, at *10.

The majority is correct in finding no error in Judge Oliver's factual findings but errs in appraising his application of those factual findings to an incorrect legal standard—one that focused on the parents' relationship rather than on their intent for the child's home. *See Friedrich v. Friedrich* (*Friedrich I*), 983 F.2d 1396, 1401 (6th Cir. 1993) ("To determine the habitual residence, the court must focus on the child, not the parents . . . ."). Accordingly, because we review the application of the correct legal standard de novo and Judge Oliver did not apply the correct standard, there was reversible error. Reviewing the court's determination in that regard does not strip the district courts of their ability to rule as the facts of each specific case dictate.

The majority is concerned that an inquiry focused on the shared intent of the parents for the child would create a legal presumption against finding a habitual residence for infants, because parents will so often disagree on such aspects of their child's life. Similarly, Judge Boggs, in his concurrence, worries that a strict two-part test would run the risk of leaving very young children, who do not have the capacity to acclimate, unprotected by the Hague Convention. Yet, I agree with Judge Moore that district courts have the ability to rule as the

facts of each specific case dictate. *See, e.g.*, *Moore Dissent* at 18 ("[H]abitual residence is not an inquiry governed by technical rules, but rather '[t]he facts and circumstances of each case should . . . be assessed without resort to presumptions or presuppositions.'") (quoting *Friedrich I*, 983 F.2d at 1401)); *Id.* at 19 ("The question of when a child is developmentally unable to acclimatize 'is not a bright-line rule, and the determination of when the acclimatization standard is impracticable must largely be made by the lower courts, which are best positioned to discern the unique facts and circumstances of each case.'") (quoting *Ahmed*, 867 F.3d at 690)); *Id.* at 20 ("This is necessarily a fact-intensive inquiry."). I thus advocate that the case be remanded back to the district court to make that determination. Determining habitual residence is a fact-intensive inquiry. But, determining whether the district court applied the right standard in appraising those facts is a legal determination.

In determining whether parents had a shared intent, Judge Oliver, as well as future district judges faced with this question in similar cases, may very well find that an infant has an established habitual residence despite her young age. But such a finding should follow from the application of the shared parental intent standard, not from a district court's previous best attempt to divine the correct standard on its own. The deference owed the district court entails letting it decide how the facts apply following *Ahmed* and the opinions here. Affirmance without the opportunity to place its factual findings within the proper legal framework takes the decision away from the district court. Accordingly, the proper result in this case is to reverse and remand with instructions for Judge Oliver to apply the shared parental intent standard as it is now defined.

---

**DISSENT**

---

JANE B. STRANCH, Circuit Judge, dissenting.  I join fully in the dissents of Judge Moore and Judge Gibbons.  I write separately because I find perplexing the lead opinion's conclusion that the dissent would surely "make the next case harder[] by assuming the role of principal decision maker."  Lead Op. at 10.  It is the lead opinion that usurps the role rightly belonging to the district court by determining how that court should apply our newly created standards to the facts the district court found from its "ring-side seat at the trial."  *Id.*  The lead opinion implies that it can say how the district court would rule because that court predicted the standard we would subsequently adopt in *Ahmed*.  It did not.  The district court addressed parental intent based on its assumption that "ordinarily a court would conclude that the intent of the parties" is to remain in the "marital home."  *Taglieri v. Monasky*, No. 1:15 CV 947, 2016 WL 10951269, at *10 (N.D. Ohio Sept. 14, 2016).  That presumption is not the test we formulated in *Ahmed* or that the lead opinion re-affirms today.  As the lead opinion explains, *Ahmed* asks the court to "identify the location where the parents 'intended the child[] to live.'"  Lead Op. at 6 (citing *Ahmed v. Ahmed*, 867 F.3d 682, 690 (6th Cir. 2017).  The district court has not had the opportunity to assess the facts of this case in light of the standards we developed after its 2016 decision.

We cannot presume what the district court would do under our new standards.  We should instead follow the procedure of our sister circuit and return this case to the district court.  *Gitter v. Gitter*, 396 F.3d 124, 136 (2d Cir. 2005) ("The district court did not know at the time of its decision the legal standard by which this court would adjudicate Hague Convention disputes.  We accordingly remand to permit the district court to consider the facts explicitly in light of this opinion.").  The principle underlying this procedure applies even more so here.  Since the district court's 2016 decision, our court has addressed the legal standards applicable to Hague Convention disputes not once but twice, resulting in the *Ahmed* panel decision and ultimately the several opinions now emerging from the en banc court.  We have struggled to choose and to articulate our standard, which suggests to me that our sister circuit has it right.  We should

remand this case to the district court to "do what district courts do best," Lead Op. at 7, and exercise its right and ability "to consider the facts explicitly in light of" the legal standards as we have now articulated them. *Gitter*, 396 F.3d at 136.